1 | Meriel L. Darzen (OR Bar No. 113645)
(503) 525-2725 | meriel@crag.org
2 | Oliver J. H. Stiefel (OR Bar No. 135436)
(503) 227-2212 | oliver@crag.org
3 | Kelsey Y. Dunn (OR Bar No. 244709)
(503) 234-0788 | kelsey@crag.org
4 | CRAG LAW CENTER
3141 E. Burnside St.
5 | Portland, OR 97214
LEAD COUNSEL
6 | *Applicants Pro Hac Vice*

7 | Thomas E. Wheeler (CA Bar No. 304191)
(707) 446-9027 | tom@wildcalifornia.org
8 | ENVIRONMENTAL PROTECTION INFORMATION CENTER
145 G. Street, Suite A
9 | Arcata, CA 95521
LOCAL COUNSEL

10 |

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KLAMATH FOREST ALLIANCE**, a California non-profit corporation, **CONSERVATION CONGRESS**, a California non-profit corporation, **ENVIRONMENTAL PROTECTION INFORMATION CENTER**, a California non-profit corporation, and **SAFE ALTERNATIVES FOR OUR FOREST ENVIRONMENT**, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> **TARA JONES**, in her official capacity as District Ranger of the Weaverville Ranger District, **RACHEL BIRKEY**, in her official capacity as Forest Supervisor of the Shasta-Trinity National Forest, **JACQUELINE BUCHANAN**, in her official capacity as Acting Regional Forester of the Pacific Southwest Region, **TOM SCHULTZ**, in his official capacity as Chief of the U.S. Forest Service, and the **UNITED STATES FOREST SERVICE**, <br><br> Defendants. | No. <br><br> (National Environmental Policy Act, National Forest Management Act, Administrative Procedure Act) |

1

## GLOSSARY OF TERMS

2

| APA | Administrative Procedure Act |
|---|---|
| D | Dispersal Habitat |
| dbh | Diameter at breast height |
| Defendants | Tara Jones, Rachel Birkey, Jacqueline Buchanan, Tom Shultz, United States Forest Service |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| EO | Executive Order |
| ESD | Emergency Situation Determination |
| F | Foraging Habitat |
| Forest | Shasta-Trinity National Forest |
| Forest Service | United States Forest Service |
| LOP | Limited Operating Procedure |
| N | Nesting Habitat |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NR | Nesting/Roosting Habitat |
| NRF | Nesting/Roosting/Foraging Habitat |
| NSO or Owl | Northern Spotted Owl |
| NWFP | Northwest Forest Plan |
| Plaintiffs or KFA | Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, Safe Alternatives for our Forest Environment |
| Project or North Trinity Project | North Trinity County Community Risk Reduction Project |
| R | Roosting Habitat |
| Service | United States Fish and Wildlife Service |
| SM | Secretarial Memo |
| USDA | United States Department of Agriculture |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 1

**INTRODUCTION**

1.      This is a civil action for declaratory and equitable relief related to the United States Forest Service's ("Forest Service") North Trinity County Community Risk Reduction Project ("Project" or "North Trinity Project") on the Shasta-Trinity National Forest ("Forest").

2.      Plaintiffs Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, and Safe Alternatives for our Forest Environment ("KFA" or "Plaintiffs") bring this challenge under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h, National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614, and the Administrative Procedure Act, 5 U.S.C. § 706. Upon the expiration of their 60-day Notice of Intent to Sue, Plaintiffs intend to amend the complaint to add claims under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*

3.      Logging operations under the Project are currently moving forward within habitat for the northern spotted owl ("NSO" or "owl"), a species listed under the ESA. While NEPA and NFMA impose procedural and substantive duties on the Forest Service to analyze environmental effects of their actions and mitigate harm to the owl, the Forest Service is implementing the Project **before** issuing a final decision and complying with its legal duties.

4.      The Forest Service originally issued a scoping notice for the Project in November, 2024, but never completed the required NEPA analysis for the Project or issued a final decision authorizing the Project.

5.      On August 25, 2025, lightning ignited the Peak Fire, ultimately burning approximately 500 acres in an area near the Project area. As of September 9, 2025, the Peak Fire was fully under control after heavy rains. On September 10, 2025, the Forest Service provided its last update on the Peak Fire, declaring containment at 95%. As of September 15, 2025, the Peak Fire was 100% contained.

6.      On October 15, 2025, the Forest Service received approval from Defendant Shultz to conduct "emergency" actions in the Project area **outside** of the fire footprint. Authorized actions are not responsive to conditions created by the Peak Fire, but rather, relate to the possibility of a **future** wildfire in the Project area.

COMPLAINT - 2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

7.     Under NEPA, the Forest Service is required to take a "hard look" at and publicly disclose a project's impacts to imperiled species like the owl. Through its procedural requirements, NEPA is designed to help agencies mitigate adverse impacts and make environmentally informed decisions. 42 U.S.C. §§ 4332(2)(C), 4336(b).

8.     Under NFMA, the applicable Land and Resource Management Plan ("Forest Plan") requires the Forest Service to maintain or enhance owl habitat consistent with the owl's Recovery Plan, which focuses on protecting occupied territories and high-quality habitat. Before implementing a project, the Forest Service is required to demonstrate how the project is consistent with the provisions of its Forest Plan. 16 U.S.C. § 1604(i).

9.     Here, however, the Forest Service is moving forward with two timber sales (Rainer and Long Canyon) implementing the Project **before** completing its NEPA process, or demonstrating consistency with the Forest Plan. The two sales involve commercial harvest of live trees across over 400 acres of public forestland which overlap with designated critical habitat for the owl.

10.    In particular, the two sales overlap or are adjacent to the Strope, Sheep Corral, Buck Ridge, and Little Mule owl territories. Upon information and belief, three of these territories are considered occupied and have supported reproduction in recent years, contributing to the larger population of owls, which is currently headed towards extinction.

11.    The Forest Service has avoided its NEPA duties by claiming that an "emergency" exists. NEPA itself does not identify procedures for emergencies, but a recently adopted Interim Final Rule governing Forest Service NEPA compliance permits the agency to undertake certain activities before complying with NEPA under certain circumstances. 7 C.F.R. § 1b.9(w). Neither NFMA or its implementing regulations identify separate and distinct procedures for responding to emergencies.

12.    No bona fide "emergency" circumstances exist in the Project area at present. Instead, the Forest Service claims as an "emergency" a need to mitigate the threat of a possible **future** wildfire. The Forest Service, however, has been planning the Project for over a year, and

COMPLAINT - 3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    was statutorily required to have already completed its NEPA review.

2        13.    Claiming an "emergency" is nothing more than a strategy to cut the public—and

3    the Service—out of the process and commence intensive commercial timber harvest, including

4    within owl habitat, prior to NEPA analysis and a demonstration of consistency with the Forest

5    Plan.

6        14.    Because there is no bona fide emergency requiring suspension of the ordinary

7    procedures under NEPA and NFMA, the Forest Service has acted arbitrarily, capriciously,

8    without observance of procedure, and contrary to law under 5 U.S.C. § 706(2), or has unlawfully

9    withheld legally required agency action under 5 U.S.C. § 706(1).

10        15.    In the alternative, if NEPA regulations permit the Forest Service to label the

11    circumstances here an "emergency" and conduct commercial logging of live trees while no fire is

12    burning and where none has burned, then the regulations themselves are unlawful as applied. If

13    the Forest Service can use emergency authorization for addressing possible future emergency

14    circumstances, then the regulations unlawfully sanction an exception that swallows the rule.

15        16.    Plaintiffs respectfully request that this Court hold unlawful the Chief's emergency

16    authorization and the decision to auction and sell the Rainier and Long Canyon timber sales,

17    enjoin the Rainier and Long Canyon Timber Sales, and compel the Forest Service to complete its

18    NEPA process, and demonstrate consistency with the Forest Plan.

19        17.    If necessary, Plaintiffs intend to seek narrowly tailored injunctive relief during the

20    pendency of this litigation.

21        18.    Should they prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the

22    Equal Access to Justice Act, 28 U.S.C. § 2412, the ESA, 16 U.S.C. § 1540(g)(4), and/or any other

23    applicable authorities.

24                                       **JURISDICTION**

25        19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1531 (federal

26    question); 5 U.S.C. §§ 701 *et seq.*, (Administrative Procedure Act); and 28 U.S.C. §§ 2201 and

27    2202 (Declaratory Judgment Act).

28    ///

    COMPLAINT - 4

1

**VENUE**

2          20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the district

3    serves "the county in which the action arises." A civil action arises in the county in which "a

4    substantial part of the events or omissions which give rise to the claim occurred[.]" 28 U.S.C.

5    § 1391(e)(1). The North Trinity Project area and the Shasta-Trinity Forest Supervisor's office are

6    located in Trinity County and Shasta County, respectively, which are served by the Eastern

7    District of California.

8          21.     **Intradistrict Assignment**. Pursuant to L.R. 120(d), assignment of this matter to

9    the Sacramento Division is proper because Trinity County and Shasta County are served by the

10   Sacramento Division.

11

**PARTIES**

12         22.     Plaintiff KLAMATH FOREST ALLIANCE is a 501(c)(3) non-profit conservation

13   organization incorporated in the State of California and based in Arcata, California. KFA works

14   in the public interest with the mission to promote sustainable ecosystems and sustainable

15   communities. KFA was founded in 1989 by residents of the Klamath and Salmon River

16   watersheds and represents over 500 members and supporters. KFA participates in forest planning

17   through agency engagement, substantive comments, and collaboration with the goal of protecting

18   and restoring the biodiversity, fisheries, wildlife, mature forests, and public lands of the Klamath-

19   Siskiyou Mountain region, including the Shasta-Trinity National Forest. KFA's members and

20   supporters use and enjoy the Project area and spend time observing and monitoring northern

21   spotted owls and their young as well as recreating in the mature and old forests where the owls

22   live. They would be irreparably harmed if the Project moves forward without a lawful BiOp and

23   if NSOs are harmed by the Project.

24         23.     Plaintiff CONSERVATION CONGRESS is a 501(c)(3) non-profit organization

25   incorporated in the State of California, dedicated to maintaining, protecting, and restoring the

26   native ecosystems of northern California. Conservation Congress has a longstanding

27   organizational interest in the proper and lawful management of National Forests located in

28   northern California, including the Shasta-Trinity National Forest. Conservation Congress also has

COMPLAINT - 5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

an organizational interest in the protection of the NSO. Conservation Congress' members, staff, and board members participate in a wide range of aesthetic, scientific, business, and recreational activities, such as hiking, fishing, hunting, photography, wildlife viewing, appreciation of scenery, and bird watching, including attempts to view and appreciate the NSO in the Shasta-Trinity National Forest, including the specific federal lands involved in the Project, and have concrete plans to continue these activities. The organization's membership includes professional photography businesses and freelance photographers who earn income by photographing in northern California's National Forests. Conservation Congress' members, staff, and board members pursue, and have concrete plans to continue pursuing, these aesthetic, scientific business and recreational activities, including on the lands involved in the Project. These interests of Conservation Congress, its members, officers, and staff are substantial and are adversely affected by Defendants' failure to comply with the ESA. The requested relief would redress the injuries of Conservation Congress and its members, staff, and board members.

24.     Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER is a nonprofit public benefit corporation organized under the laws of California and headquartered in Arcata, California. Since 1977, EPIC has defended the wildlife and wild places of the Klamath Mountains and North Coast Range. EPIC's mission is science-based protection and restoration of Northwest California's forests and seeks to ensure that a connected landscape exists for species survival and climate adaptation. EPIC's advocacy utilizes community organizing, public education, collaboration, and, when necessary, litigation. EPIC submits substantive comments on projects that would negatively impact public and private forestlands. Most of EPIC's 2,000 members and 13,000 supporters live in northern California. EPIC's members and staff use, enjoy, and recreate on public lands, including those within the Project area on the Shasta-Trinity National Forest. EPIC's members enjoy monitoring northern spotted owls and their young, as well as recreating in the mature and old forests where the owls live. They would be irreparably injured by the Project and the corresponding harm to NSOs.

25.     Plaintiff SAFE ALTERNATIVES FOR OUR FOREST ENVIRONMENT ("SAFE") is a 501(c)(3) non-profit conservation organization incorporated in the State of

COMPLAINT - 6

California and based in Trinity County, California. SAFE was founded in 1979 to advocate for and inform the public about environmentally sound forest management. SAFE has worked for decades to reduce the number of clear cuts and herbicide spray sites on both public and private lands in Trinity County.

26.     Plaintiffs, and their members, supporters, and staff regularly visit and enjoy the Forest, including the Project area, and intend to do so again in the near future. The members, supporters, and staff appreciate the aesthetics of the Forest and use the area to engage in recreational, scientific, and spiritual activities, such as hiking, camping, fishing, photography, watershed research, and observing wildlife, including and specifically focusing on northern spotted owls.

27.     Plaintiffs have organizational interests in the proper and lawful management of the Forest. Plaintiffs, and their members, supporters, and staff have participated extensively in relevant administrative actions and have actively participated in the Project's administrative process.

28.     Plaintiffs, and their members, supporters, and staff would sustain injury to aesthetic, educational, recreational, spiritual, and scientific interests if the Project proceeds as authorized and if NSOs are harmed by the project. Plaintiffs, and their members, supporters, and staff have concrete plans to return to the area where the Project is proposed. Unless this Court grants the requested relief, Plaintiffs, and their members, and staff will be adversely and irreparably harmed by the Project.

29.     Defendant TARA JONES is the District Ranger for the Hayfork and Weaverville Ranger Districts, where all or a significant portion of the North Trinity Project and/or the Peak Fire – North Trinity Emergency Response activities would occur. Upon information and belief, Ms. Jones is the responsible official for the North Trinity Project, and/or the Peak Fire – North Trinity Emergency Response. Plaintiffs bring this action against Ms. Jones in her official capacity.

30.     Defendant RACHEL BIRKEY is the Forest Supervisor for the Shasta-Trinity National Forest, where all or a significant portion of the North Trinity Project and/or the Peak

COMPLAINT - 7

Fire – North Trinity Emergency Response activities would occur. Upon information and belief, Ms. Birkey is the responsible official for the North Trinity Project and/or the Peak Fire – North Trinity Emergency Response. Plaintiffs bring this action against Ms. Birkey in her official capacity.

31.     Defendant JACQUELINE BUCHANAN is the Regional Forester for the Forest Service Pacific Southwest Region (Region 5), where all or a significant portion of the North Trinity Project and/or the Peak Fire – North Trinity Emergency Response activities would occur. Upon information and belief, Ms. Buchanan is the responsible official for the North Trinity Project and/or the Peak Fire – North Trinity Emergency Response. Plaintiffs bring this action against Ms. Buchanan in her official capacity.

32.     Defendant TOM SCHULTZ is the Chief of the United States Forest Service. Chief Schultz signed the emergency approval for the North Trinity Emergency Response. Plaintiffs bring this action against Mr. Schultz in his official capacity.

33.     Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the U.S. Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has nine regions across the country. The national forests of California, including the Shasta-Trinity National Forest, are in Region 5. All or a significant portion of the actions and omissions alleged in this complaint occurred in Region 5.

## LEGAL BACKGROUND

### National Environmental Policy Act

34.     NEPA requires federal agencies to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" "to the fullest extent possible." 42 U.S.C. §§ 4321, 4332.

35.     NEPA has twin aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87,

COMPLAINT - 8

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-227-2212

1    97 (1983) (quotations omitted).

2        36.    NEPA's objectives are "realized through a set of 'action-forcing' procedures that

3    require that agencies take a hard look at environmental consequences, . . . and [] provide for broad

4    dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens*

5    *Council*, 490 U.S. 332, 350 (1989) (quotations omitted).

6        37.    These action-forcing procedures require agencies to complete certain requirements

7    for "every" "proposal[]" for "major Federal action." 42 U.S.C. §§ 4332, 4336.

8        38.    A "proposal" exists if "an agency has a goal, is actively preparing to make a

9    decision on one or more alternative means of accomplishing that goal, and can meaningfully

10   evaluate its effects." *Id.* § 4336e(12).

11       39.    A "major Federal action" means "an action that the agency carrying out such

12   action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10).

13       40.    If a proposal for major federal action "has a reasonably foreseeable significant

14   effect on the quality of the human environment," the agency "shall issue" a "detailed"

15   "environmental impact statement" ("EIS"). *Id.* §§ 4332(2)(C), 4336(b)(1).

16       41.    If a "proposed agency action . . . does not have a reasonably foreseeable significant

17   effect on the quality of the human environment, or if the significance of such effect is unknown,"

18   then the agency "shall prepare" a "concise" "environmental assessment" ("EA") that "set[s] forth

19   the basis of such agency's finding of no significant impact or determination that an [EIS] is

20   necessary." *Id.* § 4336(b)(2).

21       42.    The documentation for an EIS or EA must be prepared before the action can begin,

22   7 C.F.R. §§ 1b.3(j); 1b.6(f); 1b.8(e) unless the Forest Service has an emergency authorization to

23   proceed "before the NEPA process can be completed," *id.* § 1b.9(w).[1]

24   _____

25       [1] The Department of Agriculture ("USDA") issued an Interim Final Rule modifying USDA NEPA
     implementing regulations and removing various USDA agency NEPA implementing regulations, including the Forest

26   Service's. 90 F.R. 29,632 (July 3, 2025). Previously, the Forest Service's NEPA implementing regulations at 36
     C.F.R. § 220.4(b) provided for "emergency responses." The North Trinity Project was initiated when the Forest

27   Service's previous implementing regulations were in place. The Interim Final Rule provides that agencies have the
     discretion to begin applying the new USDA NEPA implementing regulations effective July 3, 2025 where is makes
     sense to do so for existing proposals or applications that are in the early stages of the applicable NEPA process and

28   can easily transition to using the revised USDA NEPA regulations.

COMPLAINT - 9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

43.     An emergency authorization is only available when "emergency circumstances exist that make it necessary to take urgently needed actions before the NEPA process can be completed." *Id.* § 1b.9(w).

44.     For an EIS-level analysis, such an authorization must be jointly approved by the Department of Agriculture and the Council on Environmental Quality. *Id.* § 1b.9(w)(2). For an EA- or CE-level analysis, the emergency authorization may be issued by the Forest Service's Chief or Associate Chief. *Id.* § 1b.9(w)(1)(iv).

45.     In any case, emergency authorizations are limited to "actions necessary to address the emergency circumstance." *Id.* § 1b.9(w)(1)–(2).

**National Forest Management Act**

46.     NFMA is the primary statute governing the administration of America's National Forests. Pursuant to NFMA and its implementing regulations, management of National Forests occurs at two levels: forest and project.

47.     At the forest level, NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a).

48.     Such Forest Plans must provide for multiple use and sustained yield and include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. *Id.* § 1604(e)(1). A Forest Plan is a broad, long-term programmatic planning document for the entire forest, containing goals and objectives for individual units of the forest and providing standards and guidelines for management of forest resources.

49.     At the project level, once a Forest Plan is in place, site-specific actions are planned and evaluated by the Forest Service. Each site-specific action must be consistent with the governing Forest Plan. *Id.* § 1604(i).

50.     In 1995, the Forest Service adopted a Forest Plan for the Shasta-Trinity National Forest, which provides standards and guidelines for project-level planning within the Forest.

51.     The Forest Plan contains forest-wide standards and guidelines applicable to wildlife. For ESA-listed species like the owl, the Forest Plan provides, *inter alia*, that the Forest

COMPLAINT - 10

1   Service is to (1) maintain and/or enhance habitat for ESA-listed species consistent with individual

2   species recovery plans; and (2) survey and evaluate habitat for ESA-listed species at the project

3   level in coordination with the Service.

4       52.     Because the Forest is within the range of the northern spotted owl, the standards

5   and guidelines of the Northwest Forest Plan ("NWFP") also apply. The NWFP establishes

6   management requirements relating to the protection of the owl. In particular, the NWFP

7   establishes a system of Late-Successional Reserves, which are designed to protect and enhance

8   conditions of late-successional and old-growth forest ecosystems. The NWFP restricts logging

9   activities in Late-Successional Reserves.

10                              **Administrative Procedure Act**

11      53.     The APA, 5 U.S.C. §§ 701–06, confers a right of judicial review on any person

12  adversely affected by agency action. The APA provides a cause of action to challenge any final

13  agency action taken pursuant to any statute where the action is made reviewable by that statute, or

14  where there is no other adequate remedy in a court. The APA also authorizes a reviewing court to

15  compel agency action that is unlawfully withheld or unreasonably delayed.

16      54.     Pursuant to the APA, a court shall "hold unlawful and set aside agency actions,

17  findings, and conclusions found to be . . . arbitrary capricious, an abuse of discretion, or otherwise

18  not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; or

19  "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

20      55.     Additionally, a court shall "compel agency action unlawfully withheld or

21  unreasonably delayed. *Id.* § 706(1).

22                                **FACTUAL BACKGROUND**

23                       **The Project and Its Imminent Implementation**

24      56.     The Project area is situated in northern Trinity County along State Route 3 and the

25  eastern flank of Trinity Lake.

26      57.     On November 18, 2024, the Forest Service issued a Scoping Proposal and invited

27  public comment on the Project. On December 18, 2024, the Forest Service extended the comment

28  period to January 3, 2025.

COMPLAINT - 11

58.     According to the Scoping Proposal, the Project seeks to reduce hazardous fuels, improve forest health and resiliency, and improve visitor experience across approximately 12,500 acres. Various "treatments" are proposed, including "Forest Resilience" and establishing "Fuel Management Zones" that reduce tree densities. A majority of the Forest Resilience and Fuel Management Zone treatments are proposed in the "Late Successional Reserve" land allocation, a zone of the Forest that has been set aside as habitat for the owl and other old-growth dependent species. The Scoping Proposal stipulates that treatments within suitable owl habitat will be developed in consultation with the Service.

59.     The Scoping Proposal advises that the Forest Service plans to seek approval under the Western Fireshed Emergency Action Determination. Section 40807 of the Infrastructure Investment and Jobs Act ("IIJA"), P.L. 117-58 (codified at 16 U.S.C. 6592c) authorizes certain vegetation management activities where an "emergency situation" exists on National Forest System ("NFS") land. An "emergency situation" is a situation on NFS land for which immediate implementation of authorized emergency actions is necessary to achieve, *inter alia*, mitigation of threats to natural resources on NFS or adjacent land. 16 U.S.C. §6592c(a)(2).

60.     Plaintiffs timely provided scoping comments. They expressed grave concerns over the Project's likely impacts on the owl, including the reproductively successful owl pairs in the area, and implored the Forest Service to take a more measured approach within and adjacent to occupied areas and high-quality habitat, consistent with the Recovery Plan. Additionally, Plaintiff Conservation Congress incorporated by reference comments from biologist Tonja Chi, which reinforce dire consequences to the owl if the Project proceeds as scoped.

61.     Plaintiffs also identified the "checkerboard" nature of the Project area, which contains areas of NFS land interspersed with private lands. These private lands are predominately owned by timber companies and heavily logged to the degree they no longer support viable owl habitat. This makes the adjacent public lands all the more important for maintaining key habitat.

62.     The Forest Service released no further Project documents and did not provide the public with any further information about the Project, aside from a public meeting on November 20, 2025, which was held after logging activities had begun.

COMPLAINT - 12

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

63.     To date, no final decision has been issued for the Project, and neither NEPA analysis nor ESA consultation has been completed.

64.     After the Project was scoped, on March 1, 2025, President Trump issued Executive Order ("EO") 14225—Immediate Expansion of American Timber Production. The purpose of EO 14225 was to reverse policies that impede the ability to fully exploit the domestic timber supply.

65.     EO 14225 directs the Secretaries of Interior and Agriculture to issue guidance regarding tools to facilitate increased timber production and sound forest management.

66.     EO 14225 also directs agencies to eliminate all undue delays within their respective permitting processes related to timber production, and to suspend, revise, or rescind regulations and policies that impose an undue burden on timber production. EO 14225 further orders the use of ESA regulations on consultations in emergencies to facilitate the Nation's timber production.

67.     On April 3, 2025, the Secretary of Agriculture issued Secretary's Memorandum ("SM") 1078-006—Increasing Timber Production and Designating an Emergency Situation on National Forest System Lands. SM 1078-006 notes that heavy handed federal policies have prevented full utilization of timber resources and states a need to reverse these policies to increase domestic timber production to protect national and economic security.

68.     SM 1078-006 states that National Forests are in a crisis due to uncharacteristically severe wildfires, insect and disease outbreaks, invasive species, and other stressors. To address the crisis, the SM 1078-006 makes an Emergency Situation Determination ("ESD") under Section 40807 of the IIJA, encompassing 112,646,000 acres of NFS lands (or approximately 78% of the forested acres on NFS lands). SM 1078-006 authorizes the Forest Service to carry out emergency actions pursuant to Section 40807 of the IIJA if 50% of an area is designated within the ESD area.

69.     According to Section 40807 of the IIJA, authorized emergency actions include removal of hazardous trees in close proximity to roads and trails, and removal of hazardous fuels. *See* 16 U.S.C. § 6592c(b)(2). Under Section 40807, when conducting environmental analysis pursuant to NEPA, an agency need only analyze two alternatives in detail—the proposed action and the no action alternatives. *Id.* § 6592c(c). Furthermore, Section 40807 provides that an

COMPLAINT - 13

authorized emergency action is not subject to the pre-decisional administrative review process under 16 U.S.C. § 6516. *Id.* § 6592c(d). *See also* 36 C.F.R. Part 218 (providing for pre-decisional "objection" process, in which commenters on a project may submit objections to the Forest Service prior to a final decision). Section 40807 does not allow authorized emergency actions to proceed before NEPA analysis is completed. Section 40807 requires public comment during the preparation of an environmental assessment, and further requires that authorized emergency actions shall be conducted consistent with the applicable forest plan. 16 U.S.C. § 6592c(b)(3), (c)(3)

70.    On October 1, 2025, the Federal government entered a shutdown.

71.    Upon information and belief, on October 15, 2025, Forest Service Chief Tom Schultz approved a request from the "Peak Fire Emergency Response Project", which consists of 1,200 acres of activities, a subset of the North Trinity Project, including the Rainer and Long Canyon timber sales.

72.    On October 20, 2025, the Forest Service advertised the Rainier Timber Sale, and accepted bids on November 3, 2025. The Rainier Timber Sale area encompasses 970 acres with an estimated 14,284.74 tons of sawtimber. Advertisement and contract documents were posted on the Forest's website, but no affirmative notice of the sale was provided to Plaintiffs or to the public, generally. Advertisement and contract documents do not disclose which project the Rainier Timber Sale implements. The contract terminates on February 1, 2026.

73.    On October 24, 2025, the Forest Service advertised the Long Canyon Timber Sale, and accepted bids on November 7, 2025. The Long Canyon Timber Sale area encompasses 1,024 acres with an estimated 9,588.00 tons of sawtimber. Advertisement and contract documents were posted on the Forest's website, but no affirmative notice of the sale was provided to Plaintiffs or to the public, generally. Advertisement and contract documents do not disclose which project the Rainier Timber Sale implements. The contract terminates on January 31, 2026.

74.    Both contracts involve logging activities within owl habitat, to the degree that NRF habitat will be negatively affected. Both contracts provide for Limited Operating Periods ("LOPs"), which prohibit (1) activities that modify suitable habitat within 0.5 miles of an active

COMPLAINT - 14

owl nest or within un-surveyed suitable NRF habitat until September 15; and (2) activities that create above-ambient loud and continuous noise for more than two hours within 0.25 miles of an active nest or un-surveyed suitable owl habitat. Upon information and belief, the contracts terminate on February 1 and January 31, respectively, so as to facilitate logging activities within owl habitat before the LOPs begin.

75.    Both contracts permit the cutting of trees up to 30 inches in diameter at breast height ("dbh").

76.    Within the sale areas, the timber purchaser is required to cut and remove trees above 8" dbh or 10" dbh, but not smaller trees or brush.

77.    Upon information and belief, the contracts permit, but do not require, the timber purchaser to cut and remove trees within plantations (i.e., areas that were previously clear-cut logged and replanted with even-aged, single species).

78.    Instead, the timber sale areas required to be cut under the contracts are in stands that have not been previously logged and replanted, i.e. "natural stands."

79.    According to the best available scientific and commercial information, commercial logging operations increase short-term fire risk. In contrast, non-commercial activities including hand-thinning small diameter trees and prescribed burning, can help reduce short-term fire risk.

80.    On or around October 27, 2025, Plaintiffs learned of the two timber sales. Soon thereafter, Plaintiffs began surmising that the Forest Service may be implementing the Project through the two timber sales.

81.    On November 4, 2025, a representative of Plaintiff Conservation Congress emailed representatives of the Forest inquiring about the timber sales and the status of the Project.

82.    On November 12, 2025, the Federal government shutdown ended. On November 13, Defendant Jones emailed Plaintiff Conservation Congress explaining that the Project does not yet have a final decision but that it is on track for a decision in 2026.

83.    Defendant Jones further advised that a portion of the Project, approximately 1,200 acres, had been identified as an emergency and approved for immediate implementation by Defendant Schultz utilizing an alternative arrangement for NEPA compliance under 7 C.F.R.

COMPLAINT - 15

1b.9(w). According to Defendant Jones, this is being accomplished by, *inter alia*, the Rainier and Long Canyon Timber Sales.

84.     Upon information and belief, the Forest Service requested emergency ESA consultation with the Service on or around November 7, 2025, **after** the Forest Service had planned, advertised, and accepted bids for the two timber sales.

85.     Plaintiffs, including Conservation Congress, have sent additional communications to the Forest Service requesting more information about the Project, the emergency authorization, and the implementation of the two timber sales.

86.     On November 18, 2025, members of Plaintiffs attended a meeting with the Forest Service regarding the Long Canyon and Rainier timber sales and the emergency authorization for the portion of the Project.

87.     On November 20, 2025, counsel for Plaintiffs sent attorneys for the Forest Service an email requesting that they produce information relating to the emergency authorization.

88.     On November 21, 2025, an attorney for the Forest Service responded to Plaintiffs' counsel's inquiry and provided information regarding emergency consultation under the ESA, but did not provide the emergency authorization.

89.     On November 21, 2025, counsel for Plaintiffs provided the attorneys for the Forest Service with a copy of a Notice of Intent to Sue under the Endangered Species Act. The original of the Notice was mailed on November 24, 2025.

90.     On November 25, 2025, counsel for the Forest Service provided counsel for Plaintiffs with the Peak Fire – North Trinity Propose Emergency Response request and approval. The request is dated November 19, 2025, and the approval is dated November 25, 2025, but the document states that an identical request/approval document was signed on October 15, 2025 except for the removal of a "Deliberative, Pre-Decisional, For Internal Coordination Only" note, which allegedly was unintentionally left on the final document. The Forest Service has not provided Plaintiffs with the original October 15, 2025 document.

91.     The request states that granting approval for emergency response would allow immediate implementation of fuels reductions treatments to address an imminent threat to human

COMPLAINT - 16

health and safety posed by severe and destructive wildfire. The proposed activities are all proactive, not responsive, geared toward addressing the threat of wildfire over the next several fire seasons.

92.     The request states that the Forest believes the proposed emergency actions meet the Secretary's criteria for proactively addressing emergency conditions before they result in catastrophic loss of resources, economic activity, or human life.

93.     There are no emergency circumstances that require urgent action, such as logging older, heterogenous stands, within the Rainier and Long Canyon Timber Sale areas.

94.     If there are any such emergency circumstances, the activities that will occur as a result of the Rainier and Long Canyon Timber Sales are not necessary to address the emergency circumstances.

## Owls in the Project Area

95.     The Scoping Proposal acknowledges that northern Trinity County is rich in owl habitat and occurrences. Upon information and belief, the Project area contains eight owl territories, at least three of which are considered occupied: Strope, Sheep Corral, and Buck Ridge. Upon information and belief, Strope and Sheep Corral have active nesting.

96.     The area traversed by an individual or pair in their normal activities of breeding, feeding, and sheltering is called the "home range" or territory, and it generally extends 1.3 miles in all directions around the nest site or activity center (approximately 3,398 acres). The 100 acres around a nest site is commonly referred to as the "nest stand." The ½-mile radius circle (500 acres) surrounding the nest site ordinarily sees concentrated use and is called the "core" area. For survey and management purposes, the Service defines an "activity center" as the location or point representing the best of detections around a central location such as a nest site.

97.     Because habitat in the interior portion of the NSO range in California is often more heterogenous than in coastal areas, core use areas and home ranges for NSOs are often more accurately depicted by non-circular polygons that often follow drainages where higher quality habitat is present. While actual core use areas and home ranges likely conform to the distribution of high-quality habitat and are therefore non-circular, the circular core area (1/2-mile radius

COMPLAINT - 17

circle) home range 1.3-mile radius circle) represent reasonable approximations of the area which territorial NSOs defend and obtain most resources.

98.    NSO habitat is categorized as either nesting/roosting ("NR"), foraging ("F"), or dispersal ("D") habitat, depending on the types of life activities it can support. NSOs need sufficient quantities of each habitat type to survive and reproduce.

99.    The owl territories within the Project area are situated within the California Klamath Recovery Unit.

100.    The California Klamath Recovery Unit encompasses approximately six million acres and is considered essential to NSO conservation because it helps maintain habitat linkages, provides demographic support among NSO populations, supports dispersal, maintains the potential for genetic interchange, and tempers (to a certain extent) the adverse effects caused by competition with barred owls.

101.    Along with the Oregon Klamath Recovery Unit, the California Klamath recovery unit is considered to be a demographic stronghold for the rangewide population, with continued reproduction that plays a critical role in maintaining population stability. Both recovery units contain a "source" population of NSOs and therefore are targeted for habitat protection and restoration.

102.    In June of 1990, the Service listed the NSO as "threatened" under the ESA due to concerns over widespread habitat loss, habitat modification, and lack of protective regulatory mechanisms. *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)). Critical habitat for the NSO was first designated in 1992 and was last revised in 2021. *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl*, 86 Fed. Reg. 62,606 (December 10, 2021) (codified at 50 C.F.R. § 17.05).

103.    On account of ongoing and increasing threats including habitat loss from logging and wildfires and the invasion of the barred owl, the Service determined that "uplisting" the NSO from threatened to "endangered" was warranted, although precluded at this time by higher priority listing decisions. *Endangered and Threatened Wildlife and Plants; 12-Month Finding for*

COMPLAINT - 18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1  *the Northern Spotted Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020).

2      104.    The Service determined that the current rate of decline raises concerns about the

3  long-term persistence of the NSO throughout the Pacific Northwest: the stressors acting on the

4  NSO and its habitat, particularly rangewide competition from the nonnative barred owl and high-

5  severity wildfire are of such imminent, intensity, and magnitude to indicate that the NSO is in

6  danger of extinction throughout all of its range.

7      105.    Several recent scientific and peer-reviewed papers have warned that if these trends

8  continue, the NSO will become extirpated throughout large portions of its range in the next

9  decade. In fact, the species may already be in an "extinction vortex," in which a species' decline

10  to only a few individuals can lead to demographic stochasticity, inbreeding, and disrupted

11  behaviors, resulting in a rapid progression to extinction in just a few years.

12      106.    The Service has determined that the only way to arrest the precipitous decline of

13  the NSO and to have a high probability of preventing extinction is to both manage the barred owl

14  threat and conserve adequate amounts of high-quality habitat distributed across the range in a

15  pattern that provides acceptable levels of connectivity as well as protection from stochastic

16  events.

17      107.    As required by ESA Section 4, the Service published a Revised Recovery Plan for

18  the NSO in 2011. 16 U.S.C. §1533(f). The Revised Recovery Plan sets recovery goals, objectives,

19  criteria, and actions.

20      108.    The Revised Recovery Plan describes 33 Recovery Actions, which are

21  recommendations to guide the activities needed to accomplish the recovery objectives and

22  achieve the Recovery Criteria.

23      109.    Two Recovery Actions are particularly relevant to logging activities in NSO

24  habitat on Federal land: 10 and 32. Recovery Action 10 provides: Conserve spotted owl sites and

25  high value NSO habitat to provide additional demographic support to the NSO population. The

26  basis for Recovery Action 10 is the Service's recommendation to conserve occupied NSO sites

27  throughout the species' range, especially those containing the habitat conditions to support

28  successful reproduction. Because NSO on established territories are likely to be more successful

COMPLAINT - 19

if they remain in those locations, managing to retain NSO at existing sites should be the most effective approach to bolstering the demographic contribution of a habitat conservation network and the highest priority for land managers.

110.    Recovery Action 32 provides: Because NSO recovery requires well distributed, older and more structurally complex conifer forests on Federal and non-federal lands across its range, land managers should work with the Service to maintain and restore such habitat while allowing for other threats, such as fire and insects, to be addressed by restoration management actions. These high-quality NSO stands are characterized as having large diameter trees, high amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoes, cavities, large snags, and fallen trees.

**FIRST CLAIM FOR RELIEF**

**(National Environmental Policy Act Violation)**

**Count 1**

111.    Plaintiffs repeat and hereby incorporate by reference the allegations contained in the above paragraphs.

112.    Chief Schultz' decision to authorize "alternate arrangements" and approve the Peak Fire – North Trinity Emergency Response activities, including the Rainier and Long Canyon timber sales, under 7 C.F.R. § 1b.9(w) was a final agency action. Such action was arbitrary, capricious, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A); 42 U.S.C. §§ 4332(2)(C), 4336(b).

113.    The Forest Service's decision to authorize and auction the Rainier and Long Canyon timber sales was a final agency action. Such action was arbitrary, capricious, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A); 42 U.S.C. §§ 4332(2)(C), 4336(b).

114.    In the alternative, the Forest Service's failure to prepare an Environmental Assessment or Environmental Impact Statement prior to implementing the Project constitutes agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1); 42 U.S.C. §§ 4332(2)(C), 4336(b).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1

<strong>Count 2</strong>

2      115.    By applying 7 C.F.R. § 1b.9(w) to authorize the activities implementing the North

3

Trinity Project—including the Long Canyon and Rainier timber sales, which will result in the

4

commercial logging of living, unburned forest while no wildfire is burning—the Forest Service is

5

unlawfully evading its duties under NEPA.

6

7      116.    The Forest Service's application of 7 C.F.R. § 1b.9(w) to authorize activities in a

8

non-emergent situation without complying with NEPA violates NEPA and is arbitrary,

9

capricious, an abuse of discretion, in excess of statutory authority, not in accordance with and

10

without observance of procedure required by law. 5 U.S.C. § 706(2).

11      117.    This as-applied challenge to 7 C.F.R. § 1b.9(w) is within the statute of limitations

12

because this application of the regulation has occurred within the last six years. 28 U.S.C.

13

§ 2401(a).

14

<strong><u>SECOND CLAIM FOR RELIEF</u></strong>

15

<strong>(National Forest Management Act Violation)</strong>

16

17      118.    Plaintiffs repeat and hereby incorporate by reference the allegations contained in

18

the above paragraphs.

19      119.    All Forest Service actions on the Shasta-Trinity National Forest, including the

20

North Trinity Project and its implementing activities, must be consistent with the provisions of

21

the Shasta-Trinity Forest Plan.

22      120.    The Forest Plan contains forest-wide standards and guidelines applicable to

23

wildlife. For ESA-listed species like the owl, the Forest Plan provides, *inter alia*, that the Forest

24

Service is to (1) maintain and/or enhance habitat for ESA-listed species consistent with individual

25

species recovery plans; and (2) survey and evaluate habitat for ESA-listed species at the project

26

level in coordination with the Service.

27      121.    The Forest Service has failed to establish that the North Trinity Project and its

28

implementing activities, including those taken pursuant to the emergency response, are consistent

COMPLAINT - 21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1   with the provisions of the Forest Plan.

2       122.    The Forest Service's failure to demonstrate consistency with the governing Forest

3   Plan is arbitrary, capricious, not in accordance with, and without observance of procedure

4   required by law. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1604(i).

5       123.    In the alternative, the Forest Service's failure to demonstrate consistency with the

6   governing Forest Plan constitutes agency action unlawfully withheld or unreasonably delayed. 5

7   U.S.C. § 706(1); 16 U.S.C. § 1604(i).

8                                    **RELIEF REQUESTED**

9       WHEREFORE, Plaintiffs respectfully request the following relief from this Court:

10      (a)     DECLARE the Forest Service's application of 7 C.F.R. § 1b.9(w) to a non-

11  emergent situation, and authorization of commercial logging activities pursuant to such

12  application, arbitrary, capricious, without observance of procedure required by, and not in

13  accordance with NEPA;

14      (b)     DECLARE that the Forest Service's failure to prepare an Environmental

15  Assessment or Environmental Impact Statement prior to implementing the Project constitutes

16  agency action unlawfully withheld or unreasonably delayed;

17      (c)     DECLARE that, to the extent 7 C.F.R. § 1b.9(w) permits the emergency

18  declaration and emergency activities here, then 7 C.F.R. § 1b.9(w) is unlawful as applied;

19      (d)     DECLARE the Forest Service's failure to demonstrate consistency with the Forest

20  Plan arbitrary, capricious, without observance of procedure required by, and not in accordance

21  with NFMA;

22      (e)     ISSUE preliminary and permanent injunctive relief prohibiting the Forest Service

23  from implementing the North Trinity Project, unless and until the agency has completed lawful

24  NEPA analysis and demonstrated consistency with the Forest Plan;

25      (f)     AWARD Plaintiffs their costs, including expenses, expert witness fees, and

26  reasonable attorney's fees under applicable law; and

27      (g)     GRANT Plaintiffs such further relief as this Court deems just and proper.

28

COMPLAINT - 22

1  DATED this 25th day of November, 2025

2

3  Respectfully submitted,

4      /s/ Meriel L. Darzen
       Meriel L. Darzen (OR Bar # 113645)
5      (503) 525-2725 | meriel@crag.org
       Oliver J. H. Stiefel (OR Bar # 135436)
6      (503) 227-2212 | oliver@crag.org
       Kelsey Y. Dunn (OR Bar No. 244709)
7      (503) 234-0788 | kelsey@crag.org
       CRAG LAW CENTER
8      3141 E. Burnside St.
       Portland, Oregon 97214
9      Fax: (503) 296-5454

10     /s/ Thomas E. Wheeler
       Thomas E. Wheeler (CA Bar No. 304191)
11     (707) 446-9027 | tom@wildcalifornia.org
       ENVIRONMENTAL PROTECTION INFORMATION CENTER
12     145 G. Street, Suite A
       Arcata, CA 95521

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 23