1

2

3

4

5

6

7

8

9

ADAM A.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

ERIKA DANIELLE NORMAN (CA Bar No. 268425)
Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 532-3143
(202) 305-0506 (fax)
Erika.norman@usdoj.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

KLAMATH FOREST ALLIANCE, *et al.*,

     Plaintiffs,

     v.

TARA JONES, in her official capacity as District
Ranger of the Weaverville Ranger District, *et al.*,

     Defendants.

Case No. 2:25-cv-03424-DMC

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER/
PRELIMINARY INJUNCTION**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................ 1

STATUTORY BACKGROUND ......................................................................... 3

    A.    National Environmental Policy Act. ..................................................... 3

    B.    National Forest Management Act. ......................................................... 4

STANDARDS OF REVIEW ............................................................................... 4

    A.    Standards for Obtaining Emergency Relief. .......................................... 4

    B.    Review of Agency Action under the Administrative Procedure Act. ..... 5

FACTUAL BACKGROUND ............................................................................... 6

    A.    California's National Forests are in a State of Emergency. ................... 6

    B.    The Shasta-Trinity National Forest and Emergency Response. ............ 7

    C.    Emergency Consultation Under the Endangered Species Act. ............. 10

    D.    Status of Implementation of the Emergency Response. ...................... 10

    E.    Relationship to Larger North Trinity County Community Risk Reduction Project. ...... 12

ARGUMENT ..................................................................................................... 12

    A.    Plaintiffs Fail to Show a Likelihood of Success of the Merits. ........... 12

            a.    The Emergency Response Complies with NEPA (Count 1) ........ 12

            b.    The Emergency Response Complies with NFMA (Count 2). ..... 17

    B.    Plaintiffs Fail to Demonstrate Imminent Irreparable Injury to Their Interests. ............. 19

    C.    The Balance of Equities and the Public Interest Favor Defendants ............... 21

PLAINTIFFS MUST POST A BOND ............................................................... 23

CONCLUSION .................................................................................................. 25

i

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Alaska Env't Ctr. v. U.S. Dep't of the Interior,*
   983 F.3d 1077 (9th Cir. 2020) ......................................................................... 5

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................... 5, 12, 23

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987)...................................................................................... 20

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
   729 F.3d 937 (9th Cir. 2013) ......................................................................... 5

*Cal. Nat. Res. Agency v. Ross,*
   No. 1:20-CV-00426-DAD-EPG, 2020 WL 2404853 (E.D. Cal. May 11, 2020) ................ 24

*Conservation Cong. v. Heywood,*
   No. 2:11-CV-02250-MCE-CMK, 2015 WL 5255346 (E.D. Cal. Sept. 9, 2015)................. 18

*Conservation Cong. v. U.S. Forest Serv.,*
   720 F.3d 1048 (9th Cir. 2013) ......................................................................... 5

*Conservation Cong. v. U.S. Forest Serv.,*
   774 F. App'x 364 (9th Cir. 2019) ..................................................................... 21

*Conservation Cong. v. United States Forest Serv.,*
   235 F. Supp. 3d 1189 (E.D. Cal. 2017) ....................................................... 18, 19

*Credit Bureau Connection, Inc. v. Pardini,*
   726 F. Supp. 2d 1107 (E.D. Cal. 2010) .............................................................. 4

*Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.,*
   61 F.4th 633 (9th Cir. 2023) ......................................................................... 16

*Earth Island Inst. v. Carlton,*
   626 F.3d 462 (E.D. Cal. Aug. 20, 2009)............................................................. 22

*Earth Island Inst. v. Pengilly,*
   376 F. Supp. 2d 994 (E.D. Cal. July 2, 2005)..................................................... 15

*Envtl. Council of Sacramento v. Slater,*
   184 F. Supp. 2d 1016 (E.D. Cal. 2000) ............................................................. 21

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.,*
   No. 2:16-cv-0293-TOR, 2017 WL 2962771 (E.D. Wash. July 11, 2017)................... 4, 15

*Friends of the Animals v. BLM,*
   No. 16-1670, 2018 WL 1612836 (D. Or. Apr. 2, 2018) ......................................... 15

*Gerritsen v. Warner Bros. Ent. Inc.,*
   112 F. Supp. 3d 1011 (C.D. Cal. 2015) .............................................................. 7

ii

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)........................................................................6

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ......................................................5, 21

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ......................................................................20

*Modesto Irrigation Dist. v. Gutierrez*,
  619 F.3d 1024 (9th Cir. 2010) ........................................................5

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) ..........................................................................5

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................................4

*Native Ecosystems Council v. U.S. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) ......................................................5, 19

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ........................................................6

*Nevada v. United States*,
  364 F. Supp. 3d 1146 (D. Nev. 2019) ............................................20

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................21

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................................4

*Or. Nat. Desert Ass'n v. United States Forest Serv.*,
  957 F.3d 1024 (9th Cir. 2020) ....................................................4, 17

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) ........................................................24

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
  605 U.S. 168 (2025)......................................................................3, 5

*Siskiyou Reg'l Educ. Project v. Goodman*,
  No. Civ. 04-3058 CO, 2005 WL 2083011 (D. Or. July 29, 2005) ......15

*United Farm Workers v. Perdue*,
  No. 1:20-cv-01452-DAD-JLT, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020)......24

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ..........................................4, 5, 12, 19, 20, 21, 23

**Statutes**

16 U.S.C. § 1604(a) ..............................................................................4

iii

16 U.S.C. § 1604(i) ............................................................................. 4

16 U.S.C. § 6592c ............................................................................. 17

42 U.S.C. § 4332 ......................................................................... 3, 12

42 U.S.C. § 4332(2)(C) ..................................................................... 3

42 U.S.C. § 4336a(g)(1)(B) ............................................................ 16

5 U.S.C. § 706(2)(A) .......................................................................... 5

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 40807 ............ 16

**Rules**

Federal Rule of Civil Procedure 65(c) ............................................ 23

**Regulations**

36 C.F.R. § 219.15(d) ..................................................................... 17

36 C.F.R. § 219.17(c) ..................................................................... 17

36 C.F.R. § 220.4 ............................................................................... 3

36 C.F.R. § 220.4(b) ....................................................................... 14

43 C.F.R. § 46.150(a) ..................................................................... 15

43 C.F.R. § 46.150(c) ..................................................................... 15

50 C.F.R. § 402.05 .......................................................................... 10

7 C.F.R. § 1b.11(a)(13) .............................................................. 13, 15

7 C.F.R. § 1b.9(v) ...................................................................... 3, 12

7 C.F.R. § 1b.9(w) .......................................... 1, 3, 8, 13, 16, 17, 20

7 C.F.R. § 1b.9(w)(1)(iv) .................................................................. 3

**Other Authorities**

73 Fed. Reg. 43 ................................................................................ 14

# INTRODUCTION

Trinity County is the highest fire risk county in the United States. Urgent action is needed to address an imminent and severe wildfire threat to the communities of Long Canyon and Lake Forest Estates in the county. Plaintiffs have nonetheless filed a combined motion for a temporary restraining order ("TRO") and preliminary injunction to stop work on two commercial timber sales (Rainier and Long Canyon) that are essential to the Shasta-Trinity National Forest, Peak Fire – North Trinity Emergency Response Project ("Emergency Response"). The Emergency Response consists of specific, targeted fuels reduction treatments on 1,200 deliberately-drawn acres that the Forest Service carefully determined mitigates wildfire threat. The downhill terrain, high fuels, limited road access, and proximity to wilderness of the Emergency Response area create a perfect storm for a severe wildfire to destroy thousands of acres and communities along the western side of State Route 3.

The Emergency Response is a small subset of a larger, 13,000-acre project that is still under development. Rather than wait one or two more fire seasons to implement this critical work until the Forest Service has completed the National Environmental Policy Act ("NEPA") process for the larger project—rolling the dice on whether yet another severe wildfire could destroy natural resources and homes, and place the lives of hundreds of firefighters and residents in harms' way—the Forest Service prudently chose to use the very procedures the NEPA regulations allow for *urgent but not immediate actions* and where waiting longer would be contrary to the public interest. 7 C.F.R. § 1b.9(w).

Consistent with those regulations, the Forest Service issued a Decision Memorandum in October 2025 in which the Chief of the Forest Service approved the 1,200-acre Emergency Response. Following the Decision Memorandum, the Forest Service promptly advertised and awarded the two timber sale contracts that Plaintiffs seek to enjoin. Together those sales comprise about 500 acres of the Emergency Response area and are integral to mitigating wildfire risk. Plaintiffs' combined motion asserts claims under NEPA and the National Forest Management Act ("NFMA").

Plaintiffs' NEPA claim fails on the merits because they ignore the regulatory standards and ask the Court to impose new requirements on the agency. Plaintiffs' assertions that there is no emergency because the forest is not yet on fire are contrary to law, the facts on the ground, and common sense. The

1

Long Canyon and Lake Forest Estates communities are hemmed in by overly dense forests, high levels of surface and ladder fuels, incomplete fuel management zones, and lack passable and safe emergency evacuation routes in the event of a fire—an emergency that work under the two contracts will rectify. The conditions on the ground within the 1,200-acre Emergency Response area meet the regulatory and any reasonable definition of an "emergency" for which the Forest Service can legally act *now* while completing a NEPA analysis later.

Plaintiffs' NFMA claim also fails. Under binding Ninth Circuit precedent, the Government need not demonstrate its compliance with NFMA in the written decision, and the northern spotted owl ("NSO") "Recovery Actions" Plaintiffs argue that the Emergency Response violates are not mandatory. In any event, the Emergency Response is consistent with both the Forest Plan and Recovery Action 10.

As to the remaining preliminary injunction factors under *Winter*, Plaintiffs cannot meet the irreparable harm prong, because their claims about harm to owls are based on inaccuracies and speculation. The Emergency Response treatments will maintain NSO habitat and mitigate wildfire risk, which by extension, also protects owls from future wildfires. The balance of harms and the equities also favor the Government. The harms to the public are potentially catastrophic should the sales be enjoined *now* and a wildfire burn through the untreated Emergency Response area during the next two fire seasons. The financial harms to the agency from suspending ongoing operations could easily total half a million dollars—money the agency would need to divert from other activities and programs on the Shasta-Trinty National Forest, inflicting more harm on the public.

Plaintiffs try to look reasonable by drawing their injunction request around the two sales, leaving "some" of the Emergency Response to presumably move forward. Combined Mot. for TRO and Prelim. Inj. ("Pls.' Mot.") 1, Dkt. No. 6. But without the two commercial timber sales, the Emergency Response would not have the intended benefits, especially for the two communities that lack a safe evacuation route without the Emergency Response. The Court should deny Plaintiffs' combined motion in its entirety. In the alternative, the Court should deny Plaintiffs' request for a TRO. As explained in the Government's Notice regarding its intent to respond to Plaintiffs' TRO Motion, Dkt. No. 7, the Forest Service is and will operate until December 12 in the very same unit that Plaintiffs ask this Court to

restrict the contractor to during any TRO (Unit 1A for the Long Canyon sale, *see* Pls.' Mot. 2) or in units outside of NSO habitat for the Rainier sale, where Plaintiffs cannot plausibly claim imminent irreparable harm *in the absence of a TRO*. If the Court denies only the TRO, Defendants request that the Court hold a hearing on the preliminary injunction.

## STATUTORY BACKGROUND

### A. National Environmental Policy Act.

NEPA requires federal agencies to consider the environmental consequences of proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). But "NEPA imposes no substantive environmental obligations or restrictions"—instead, it "is a purely procedural statute." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 173 (2025). Federal agencies ordinarily fulfill their procedural obligations under NEPA by preparing an environmental impact statement, an environmental assessment, or a categorical exclusion. 42 U.S.C. §§ 4336(a)(2), 4336(b)(1), 4336(b)(2); *see also* 7 U.S.C. §§ 1b.3, 1b.4, 1b.5, 1b.7 .

NEPA acknowledges that it may not be possible for agencies to fully comply with its procedures, requiring instead that agencies comply "to the fullest extent possible." 42 U.S.C. § 4332. Relevant here, the Chief or Associate Chief of the Forest Service may authorize "[u]rgent but not immediate actions" in cases where "emergency circumstances exist that make it necessary to take urgently needed actions before the NEPA process can be completed." 7 C.F.R. § 1b.9(w). In such cases where the urgent actions are not likely to have reasonably foreseeable significant environmental impacts, the responsible official "shall consult with the national headquarters office about alternative arrangements . . . and [t]he Chief or Associate Chief of the Forest Service may grant emergency alternative arrangements under NEPA for categorical exclusions, environmental assessments, and associated findings." *Id.* § 1b.9(w)(1)(iv).[1] The regulations define "emergency" as a "situation demanding immediate or urgent action, where delaying

---

[1] In July 2025, the U.S. Department Agriculture issued an interim final rule on the Department's regulations implementing NEPA. 90 Fed. Reg. 29,632 (July 3, 2025). The old emergency regulations were located at 36 C.F.R. § 220.4 and the new emergency regulations are codified at 7 C.F.R. § 1b.9(v) and (w). 90 Fed. Reg. at 29,644. Because the Emergency Response was signed in October 2025, the new regulations apply.

action to follow standard procedures would be contrary to the public interest, as determined by a responsible official." *Id.* § 1b.11(a)(13).

The allowance for emergency alternative arrangements "aligns with common sense – complying with burdensome reporting in the face of an emergency is generally not feasible or prudent." *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, No. 2:16-cv-0293-TOR, 2017 WL 2962771, at *4 (E.D. Wash. July 11, 2017), *aff'd*, 726 F. App'x 605 (9th Cir. 2018).

## B. National Forest Management Act.

NFMA establishes a two-step procedure for managing National Forest System lands. 16 U.S.C. § 1604(a), (i); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). First, the Forest Service must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Forest plans "guide all natural resource management activities" and "must take both environmental and commercial goals into account." *Ohio Forestry*, 523 U.S. at 729. Second, the Forest Service develops site specific projects to carry out the objectives in the forest plan. Those site specific projects must be consistent with the forest plan. 16 U.S.C. § 1604(i).

While NFMA requires consistency between the project and the forest plan, it does not require a *demonstration* of consistency. *Or. Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1034 (9th Cir. 2020) ("Because the Forest Service was not obligated by statute, regulation, or caselaw to memorialize each site-specific [] authorization's consistency with the forest plan, the absence of such a document is not in itself arbitrary and capricious.").

## STANDARDS OF REVIEW

## A. Standards for Obtaining Emergency Relief.

"The same standards generally apply to temporary restraining orders and preliminary injunctions." *Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1114 (E.D. Cal. 2010). Plaintiffs bear the burden to show that they are entitled to the "extraordinary and drastic remedy" of a preliminary injunction, *Munaf v. Geren*, 553 U.S. 674, 689 (2008), which is granted only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on

the merits; (2) it is likely to suffer irreparable harm absent injunctive relief; (3) the balance of the equities tips in its favor; and (4) the injunction would be in the public interest. *Id.* at 20. The Ninth Circuit has articulated an alternate formulation of the *Winter* test, where a court may find injunctive relief to be appropriate where plaintiffs can show "serious questions" going to the merits and that "the balance of hardships tips sharply" towards plaintiffs. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).[2] If the Court finds that Plaintiffs have not shown either likelihood of success or serious questions going to the merits, it can deny the motion without addressing the equitable factors. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013).

### B. Review of Agency Action under the Administrative Procedure Act.

NEPA and NFMA do not contain their own provisions for judicial review and therefore the merits of Plaintiffs' claims are reviewed under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A); *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1084 (9th Cir. 2020) ("we review . . . compliance with NEPA pursuant to the APA"); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) ("review of agency decision-making under NFMA is governed by the judicial review provisions of the APA"). "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty.*, 145 S. Ct. at 1515. This is particularly so in areas involving a "high level of technical expertise." *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008); *see also Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (review is particularly deferential when reviewing an agency's "scientific judgments and technical analyses"). The reviewing court may not substitute its judgment for the agency's, *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), and must uphold the agency's reasonable decision. *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010). A court may find that an agency has acted "arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency] made a clear error in judgment in concluding that a project meets the requirements' of [the statute]." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir.

---

[2] Federal Defendants preserve their argument that the Ninth Circuit's sliding scale approach is contrary to the Supreme Court's decision in *Winter*.

2012). It is a plaintiff's burden to demonstrate that the agency action failed to meet this highly deferential standard. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

## FACTUAL BACKGROUND

**A. California's National Forests are in a State of Emergency.**

California's National Forests are in a wildfire and forest health state of emergency. The reasons for the state of emergency include overly dense forests, extended drought, insect and disease infestations, a warming climate, and an increasing number of homes in the wildland urban interface. *See* Decl. of Tara D. Jones ("Jones Decl.") Ex. 2.[3] More than a century of fire suppression, combined with the past logging of larger, more fire-resistant trees and tree species have adversely changed the forest structure and composition. *Id.* at 2. California's National Forests are tightly packed with small and medium-sized trees of fire-susceptible species such as white fir, increased canopy cover, and heavy concentrations of fuels on the forest floor and low growing vegetation or "ladder fuels" that can readily move fire into the forest canopy. *Id.* Trees in these overly dense stands are more likely to die from increased stress, lack of water, and/or insects and disease, further exacerbating fire risk. *See id.* at 6-7.

If California's National Forests are a tinder box, a warming climate, reduced snowpack, and increasingly severe droughts are the match. In recent years, dangerous wildfires have destroyed or severely impacted communities, infrastructure, and natural resources across millions of acres with greater frequency and resulted in the loss of dozens of civilian and firefighter lives. *Id.* at 1, 4. This says nothing about the billions of dollars in consequent economic costs. *Id.* at 14. Wildfires are burning at higher severity and over larger areas than ever before. *Id.* at 5. All told, fifteen of the twenty largest wildfires in state history have occurred since 2012. *Id.*

Plaintiffs' lawsuit is focused the NSO. But high-severity fires can have devastating and long-term impacts on owls through direct mortality of individuals and eggs and reduced habitat as large trees and canopy cover critical for their survival are incinerated. The 2014 King Fire, for example, killed one of the most productive breeders within a California spotted owl population, destroyed a long-term

---

[3] This paper was originally published in 2023 and recently updated.

nesting site, and resulted in immediate site abandonment that would last six years after the fire. *Id.* at 9.

Active forest management, including thinning to reduce density and removing accumulated surface and ladder fuels, can help ensure that when wildfires occur, they burn along the surface at low-to-moderate intensity, rather than burning through the canopy and killing most trees. *Id.* at 17. Plaintiffs offer no support for their contrary assertion that "commercial logging operations . . . are known to increase short-term fire risk." Pls.' Mot. 2.

The situation facing California's forests requires urgent action to protect communities and ecosystems. Jones Decl. Ex. 2 at 22. While current forest treatments have proven effective at improving forest resilience, the pace, and scale of those treatments must be accelerated to change the trajectory of wildfire risk and restore forest health. *Id.* Recognizing the need to act now, the Forest Service has committed to using every tool at its disposal, including using emergency authorities where appropriate, to address this crisis. *Id.*

In response to the "wildfire and forest health crisis" on April 3, 2025, Secretary Rollins issued Memorandum 1078-006 making an Emergency Situation Determination under Section 40807 of the Infrastructure Investment and Jobs Act for 66,940,000 acres of National Forest System lands rated as very high or high wildfire risk. U.S. Dep't of Agric. Secretary's Mem. 1078-006 at 2-3 (Apr. 3, 2025).[4] The Emergency Response area falls within the Carville fireshed that was included in the Secretary's Emergency Situation Determination. Jones Decl. ¶ 8, but the memorandum is not the basis for the Emergency Response.

**B. The Shasta-Trinity National Forest and Emergency Response.**

The Shasta-Trinity National Forest is the largest National Forest in California, spanning 2.1 million acres across five wilderness areas and ranging from 1,000 to 14,162 feet in elevation. Jones Decl. ¶ 2. The Shasta-Trinity National Forest lies partially within Trinity County, which has experienced

---

[4] The Secretary's Memorandum is available online at https://www.usda.gov/sites/default/files/documents/sm-1078-006.pdf. "Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (quoting Fed. R. Evid. 201).

multiple high-severity, landscape-scale wildfires in recent years and has the highest wildfire risk in California and the second highest risk to homes. Jones Decl. Ex. 1 ("Decision Mem.") at 2. Earlier this year, northern Trinity County communities found themselves in the dangerous path of the 2025 Swift Complex–Peak Fire caused by lightning just inside the Trinity Alps Wilderness and which demonstrated extreme fire behavior and rapid spread potential. *Id*. This fire was contained at just over 500 acres and nearby communities were spared largely because of sheer luck—it began to rain. *Id*.; Jones Decl. ¶ 11. Two years earlier, the 2023 Deep Fire started only 6 miles from the Peak Fire, threatened the Trinity Alps Resort and surrounding residences, and burned just over 4,000 acres. Decision Mem. at 2. In summer 2021, the River Complex Fire began in the same area and burned almost 200,000 acres and devastated the nearby community of Coffee Creek, destroying 122 structures. Jones Decl. ¶ 11.

On October 7, 2025, the Acting Regional Forester for Region 5 sought approval from the Chief of the U.S. Forest Service for emergency response activities under 7 C.F.R. § 1b.9(w), which was granted on October 15, 2025 and a revised decision memorandum was issued on November 25, 2025.[5] Jones Decl. ¶ 7. The Decision Memorandum covers emergency fuels reduction treatments on approximately 1,200 acres along the State Route 3 corridor to address an imminent threat to human health and safety posed by severe and destructive wildfire. Decision Mem. 3.

The Emergency Response includes fuels reduction treatments such as mechanical treatment to thin small-to-medium-sized trees to disrupt crown continuity and reduce or remove surface and ladder fuels. Decision Mem. 1; Jones Decl. ¶ 24. Hand thinning and piling of fuels will be used where equipment is restricted. Decision Mem. 1. The Forest Service will also further develop a fuel management zone along forest roads to improve suppression capabilities and provide safe ingress and egress for fire personnel and the public around the Lake Forest and Long Canyon communities to create defensible space within the wildland urban interface and complement ongoing defensible space treatments on private lands. *Id*. at 2-3. For example, treatments will expand contingency lines that

---

[5] The only difference between the original and revised versions of the decision memorandum was the removal of a privilege header that was inadvertently left on the final document. The effective date of the decision memorandum is October 15, 2025. Jones Decl. ¶ 7.

proved critical to suppression efforts in the Peak and Deep Fires and tie in with other planned and existing fuel breaks. *Id.* at 3; Jones Decl. Fig. 4 & Ex. 5 (implementation map). At the same time it is implementing these critical treatments, the Forest Service is taking care to protect the NSO by maintaining the current habitat type, avoiding nest cores, and instituting a limited operating period, which avoids disturbance to owls during the breeding season. Jones Decl. ¶¶ 21, 24-25, 35-36, 46, 48.

The Emergency Response area is at especially high risk for severe wildfire due to dense vegetation conditions resulting from over a century of fire suppression and a lack of fire history in the area for over 100 years. Jones Decl. ¶ 13. Thick tree cover and buildup of ground and mid-level fuels mean a higher risk of stand-replacing wildfire. *Id.* The specific treatments covered by the emergency response were selected to enhance planned and existing efforts on private and federal lands and to establish critical ingress/egress routes for isolated communities. Decision Mem. 2; Jones Decl. ¶¶ 13-19. For example, the Forest Resilience treatment units included in the Rainier timber sale were strategically located to enhance the effectiveness of the shaded fuel break (Jones Decl. ¶ 22), and Plaintiffs want to enjoin these units for possibly two fire seasons.

The Emergency Response area also includes critical assets such as residential infrastructure, high-voltage transmission lines, small airports, communication sites, and community water sources. Decision Mem. at 3; Jones Decl. ¶ 20.

The Long Canyon and Lake Forest Estates communities face unique wildfire risks given the steep terrain and limited ingress/egress, their remote locations, and their proximity to wilderness areas where fire suppression efforts are more challenging. *Id.* ¶¶ 13-19. Simply put, a wildfire descending upon these communities could trap residents and firefighters causing serious injury or death. During the 2025 Peak Fire burning logs rolled downhill accelerating the fire spread and putting firefighters at the bottom of the slope at risk of injury or death. *Id.* ¶ 15. Neither community has safe and passable secondary escape routes, should their primary access to State Route 3 become blocked. *See id.* ¶ 18-19. Both timber sales will clear and treat along Forest and county roads to establish (or reestablish) evacuation routes. *Id.* ¶¶ 17-19.

C. **Emergency Consultation Under the Endangered Species Act.**

The Shasta-Trinity National Forest is home to threatened and endangered species including the NSO. About half of the Emergency Response area is located within NSO suitable habitat. Jones Decl. ¶ 44. The Forest Service has been conducting emergency consultation with the U.S. Fish and Wildlife Service ("FWS") for the Emergency Response under 50 C.F.R. § 402.05. *Id.* ¶ 31.

Coordination between the two agencies is ongoing and the Forest Service is working to implement the conservation measures FWS has identified. *See id.* ¶¶ 31-41. The Forest Service and FWS have conducted multiple field visits and meetings covering the Emergency Response activities within the context of the larger project in development and FWS has provided specific recommendations for resource protection measures, treatment prescriptions, and treatment units that the Forest Service is incorporating into the Emergency Response. *Id.* ¶ 35. For example, agreements associated with the Strope Creek NSO activity center are being carried through into the Emergency Response activities, along with resource protection measures such as limited operating periods and prescriptions based on accepted habitat typing. *Id.* ¶ 36. Neither sale authorizes harvest in any occupied "cores." *Id.* ¶ 46; *cf.* Mem. in Supp. of Combined Mot. for TRO and Prelim. Inj. ("Pls.' Br.") 11.

As soon as practicable during or following the Emergency Response, the Forest Service will meet its regulatory obligations to provide FWS with (1) a description of the emergency actions; (2) a justification for the expedited consultation; and (3) an evaluation of the impacts of the emergency response on affected species and their habitats, including documentation of how the Service's recommendations were implemented and the results of implementation in minimizing impacts to those species and habitats. *Id.* ¶ 42.

D. **Status of Implementation of the Emergency Response.**

Implementation of the Emergency Response began on November 19, 2025 and will be completed within about twelve months. Jones Decl. ¶ 47. During the implementation period, the entire 1,200 acres is subject to a limited operating period, meaning the window for implementing most of the emergency response activities is right now and will only last a few months. *Id.* ¶ 48. The Forest Service awarded two timber sale contracts for the Emergency Response; the remaining work will be done by Forest

Service employees or partners. *Id.* ¶ 50.

The Forest Service awarded a contract for the Long Canyon sale to Trinity River Lumber on November 7, 2025. *Id.* ¶ 51. The Long Canyon sale includes 206 acres of Fuel Management Zone treatment to establish fuel breaks and containment lines to protect the Long Canyon and Lake Forest Estates communities. *Id.* ¶ 52. The community of Long Canyon was threatened for the third time in four years by wildfire from the Peak Fire in late August/September 2025. *Id.* ¶ 15. The contract has a termination date of January 31, 2026, to facilitate expedited implementation of the emergency response actions before the limited operating period commences. *Id.* ¶ 51. Work on the Long Canyon contract began on November 25, 2025, in Unit 1A in the far north of the Emergency Response area and is ongoing. *Id.* ¶ 53. Any delay of work under this contract would jeopardize the contractor's ability to complete the contracted-for work before the expiration of the contract on January 31, 2026. *Id.* ¶ 62.

The Forest Service awarded a contract for the Rainier sale to Sierra Pacific Industries on November 3, 2025. Jones Decl. ¶ 54. The Rainier sale includes 225 acres near or adjacent to State Route 3 and certain county and forest roads that will create shaded fuel breaks to lower fire intensity and aid fire suppression efforts. *Id.* ¶ 55. The Rainier sale contract has a termination date of February 1, 2026, for the same reason related to the limited operating period. *Id.* ¶ 54. Harvest operations are completed in Landing 1 and portions of Units 9 and 9D. *Id.* ¶ 56. The purchaser is working in Unit 8A and in other units without nesting, roosting, or foraging habitat until December 12, 2025. *Id.* ¶ 57. If the contractor does not resume normal operations by mid-December, the contractor is unlikely to complete the contracted-for work before the expiration of the contract on February 1, 2026. *Id.* ¶ 62.

The two timber sales together make up approximately 440 acres of commercial thinning, with an additional 250 acres of optional "timber subject to agreement" that largely consist of plantations (typically younger, even-aged stands that were harvested and replanted). The remaining Emergency Response area includes non-commercial manual thinning and piling, mastication, and chipping. Jones Decl. ¶ 26. Without the commercial treatment, the non-commercial treatments would be fragmented and ineffective. *Id.* ¶ 59.

**E. Relationship to Larger North Trinity County Community Risk Reduction Project.**

The 1,200-acre Emergency Response area falls within a much larger, 12,800-acre proposed project area for the North Trinity County Community Risk Reduction Project ("Trinity Risk Reduction Project"), on which the Forest Service is actively working and anticipates finalizing an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") in late 2026. Jones Decl. ¶ 27.

The Trinity Risk Reduction Project will authorize other activities beyond what is covered by the Emergency Response (including within the 1,200 acres) and cover a much broader geographic area. *Id.* Scoping on the larger project began in 2024. Decision Mem. 3. Because the Final EA and FONSI for the Trinity Risk Reduction Project is not expected to be completed until late 2026, without the Emergency Response, the actions on the 1,200 acres could be delayed until summer 2027 or longer, leaving the communities vulnerable to the significant threat of wildfire over the next two fire seasons. *Id.* ¶ 29.

**ARGUMENT**

**A. Plaintiffs Fail to Show a Likelihood of Success of the Merits.**

Plaintiffs fall short of their burden under *Winter* to show a likelihood of success on either their NEPA or NFMA claims and their request for emergency relief can and should be denied on that basis alone. *Winter*, 555 U.S. at 20. Even under the relaxed "serious questions" standard of *Cottrell*, Plaintiffs have not made the necessary showing and the Court should deny their motion. 632 F.3d at 1134.

**a. The Emergency Response Complies with NEPA (Count 1).**

Plaintiffs' NEPA claim boils down to the erroneous contentions that conditions on the ground in the Emergency Response area are not an "emergency" because either (i) there is no active wildfire burning and/or (ii) the emergency response regulations exclude "proactive" activities. Neither theory is supported by the regulatory text, the ordinary meaning of "emergency," or common sense. While an active wildfire qualifies as an *immediate* emergency, the regulations implementing NEPA do not require the forest to wait until the forest is on fire before the agency acts quickly to address a situation that requires an *urgent* response and complete the NEPA process later. Indeed, the regulations have two separate emergency provisions, one for emergencies requiring *immediate actions* in 7 C.F.R. § 1b.9(v), and a wholly separate provision (on which the Forest Service relies on here) for emergencies requiring

1  *urgent but not immediate acti*ons in 7 C.F.R. § 1b.9(w).

2      In making their arguments, Plaintiffs ask this Court to ignore the regulatory text and impose

3  standards found nowhere in the regulation. The subject regulation does not require that the

4  decisionmaker apply any of the standards Plaintiffs interject here: "proactive," "true emergencies,"

5  "reactive," "exigent," "responsive," "preventing," "ongoing," "bona fide emergencies." The regulations

6  provide a definition of "emergency": "a situation demanding immediate or urgent action, where delaying

7  action to follow standard procedures would be contrary to the public interest." 7 C.F.R. § 1b.11(a)(13).

8  Plaintiffs drop this regulatory definition to a footnote. Pls.' Br. n.5. The 1,200-acre Emergency Response

9  easily meets it for at least four reasons. First, the area surrounding the Emergency Response area has

10 experienced multiple high-severity wildfires in the last few years, demonstrating the high fire risk in the

11 area. *See* Decision Mem. 2. Second, the fuels conditions on the 1,200 acres covered by the emergency

12 response are particularly bad due to dense vegetation conditions and high accumulations of surface and

13 ladder fuels; and the proximity to wilderness areas, steep topography, and dangerously impeded access

14 support the *urgent* need for action. Decision Mem. at 2; Jones Decl. ¶¶ 13-19. Third, the Lake Forest

15 Estates and Long Canyon communities face unique and potentially deadly risks in the event of a wildfire

16 due to lack of viable escape routes. Jones Decl. ¶¶ 17-19. Fourth, the Emergency Response area also

17 includes valuable natural resources and ecosystem services such as the NSO habitat Plaintiffs claim to

18 care deeply about that would be destroyed in the event of a severe wildfire. *Id.* ¶ 21.

19     The 1,200 acres selected for the Emergency Response action lie within the wildland urban

20 interface and contain specific features that increase the likelihood of a severe wildfire. *Id.* ¶¶ 13-16. The

21 nature and locations of the emergency work were specifically selected to have the maximum effect on

22 public safety such as the Forest and county roads to be treated under the timber sales, the specific

23 contingency lines to be expanded, and the critical buffer zones and the shaded fuel breaks to be

24 established. *Id.* ¶¶ 18-19, 22-24, Fig. 2 & Ex. 5; *see also* Decision Mem. 1 (describing the fuel

25 management zone along forest roads to improve suppression capabilities and provide safer

26 ingress/egress, defensible space, and fuel breaks). The Emergency Response is purposefully

27 implemented along the western side of State Route 3, which is the only viable travel corridor through

28                                                                                           13

northern Trinity County and the Trinity Lake area, supported by county and forest roads. Decision Mem. at 3; Jones Decl. ¶ 17. The 1,200 acres are also concentrated in an area where fire suppression efforts in the event of a wildfire would be limited, making preventive measures even more important. *E.g.*, Jones Decl. ¶¶ 14-15. The Forest Service reasonably determined that sitting on its hands until it had completed an EA and FONSI for the entire 13,000-acre area was "contrary to the public interest" as to 1,200 of those acres. *Id.* ¶ 29.

The two commercial timber sales are integral to the Emergency Response. Without them, the Emergency Response non-commercial treatments would be fragmented and not provide the necessary shaded fuel breaks, expanded contingency lines, and ingress/egress to Lake Forest Estates and Long Canyon. *Id.* ¶¶ 59. Plaintiffs wrongly understate the potential benefits of this work when they say, without any support, that "[t]hinning for purposes of fuels reduction in natural forest stands may be a long-term policy goal but it does not, particularly all of a sudden, qualify as an emergency meriting a deferral of NEPA compliance." Pls.' Br. 16.

Plaintiffs' NEPA argument focuses on the regulatory history and text of the prior emergency regulation (36 C.F.R. § 220.4(b)),[6] which the Forest Service rescinded. It has also added a new definition of the term "emergency." Even under the supplanted regulation, Plaintiffs are wrong that an emergency need be "unforeseen," "unexpected," and/or "sudden." Pls.' Br. 14-15. While some emergencies are those things, an emergency can also be "'[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures.'" *See* 73 Fed. Reg. 43,084, 43,088 (July 24, 2008) (quoting Black's Law Dictionary 260, 562 (8th ed. 2004)). Courts in this Circuit have interpreted the term "emergency" as a condition requiring an urgent or immediate response,

---

[6] That regulation covered two types of emergency responses in subparts (b)(1) and (b)(2). Subpart (b)(1) covered actions "necessary to control the immediate impacts of the emergency and are urgently needed to mitigate harm to life, property, or important natural or cultural resources" that would likely fall under Section 1b.9(v) today, which is not the basis for the emergency response at issue here (which falls under Section 1b.9(w)). The previous analog to subpart (w) is subpart (b)(2). The examples Plaintiffs cite in the preamble to the old regulation—"search and rescue or fire suppression operations responding to specific emergency situations caused by events such as flood, fire, landslides, storms, and explosions" (Pls.' Br. 16)—all relate to (b)(1), not (b)(2), and are therefore inapplicable.

14

without requiring the condition to be sudden, unforeseen, or unexpected. *See Earth Island Inst. v. Pengilly*, 376 F. Supp. 2d 994, 1008-09 (E.D. Cal. July 2, 2005) (the rapidly deteriorating value of burnt timber was an emergency because it required immediate action by the Forest Service to avoid a loss); *Siskiyou Reg'l Educ. Project v. Goodman*, No. Civ. 04-3058 CO, 2005 WL 2083011, at *7 (D. Or. July 29, 2005) (similar finding for Forest Service).[7] If there was any doubt, however, the new regulatory definition makes clear that circumstances need not be "unexpected," "unforeseen," and/or "sudden" as none of those words or similar descriptors are included in the definition. 7 C.F.R. § 1b.11(a)(13).

Plaintiffs correctly point out that "the fire risk is high in this area, it was high last year and it is high now, and reducing that risk was, and still is, the goal." Pls' Br. 15. But they are incorrect when they argue that because the Forest Service could have potentially justified the emergency response a year ago, they cannot do so now. Again, Plaintiffs are seeking to add restrictions to the emergency regulations that do not exist—there is no option period during which the Forest Service must act once "urgent" circumstances present themselves or else be shut out of its authority under subpart (w). In any event, Plaintiffs dismiss the import of the recent 2025 Peak Fire too quickly. The Swift Complex Fire (including the Peak, Lick, and Cedar Fires) were only contained at less than 700 acres due to the efforts of the more than 700 personnel who risked their lives to respond to these fires and the sheer luck of favorable weather conditions. Jones Decl. ¶ 11 & Fig. 1; https://www.fs.usda.gov/r05/shasta-trinity/newsroom/releases/swift-complex-and-cedar-fire-update-september-5-2025. These recent fires underscore the urgency of completing the Emergency Response. Jones Decl. ¶ 15 (describing how large

---

[7] The cases Plaintiffs cite under the old regulation and BLM's emergency regulation are inapposite. The Eastern District of Washington case, *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, No. 16-293, 2017 WL 2962771 (E.D. Wash. July 11, 2017), concerned prevention actions the Forest Service took under Section 220.4(b)(1), which as covered above, is more limited in applicability than subpart (b)(2) and (w) here. *Friends of the Animals v. BLM*, No. 16-1670, 2018 WL 1612836 (D. Or. Apr. 2, 2018), concerned actions which the Court found exceeded BLM's emergency authority under that agency's analog to subpart (b)(1) for actions "necessary to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources," 43 C.F.R. § 46.150(a)–(b), as distinguished from other emergency actions that go beyond controlling the immediate effects of an emergency under 43 C.F.R. § 46.150(c). In sum, both cases deal with the kind of actions now covered by Section 1b.9(v), not (w).

burning logs rolling downhill during the 2025 Peak Fire accelerated the spread, endangered firefighters, and put Long Canyon and Lake Forest Estates at risk).

Plaintiffs are wrong that the Forest Service bears the "burden to prove that the NEPA process could not have reasonably been completed [for the emergency response] before taking action." Pls.' Br. 15. As the party challenging an administrative decision as arbitrary and capricious under NEPA, Plaintiffs—not Defendants—bear the burden of proof and persuasion. *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 61 F.4th 633, 639–40 (9th Cir. 2023). In any event, Plaintiffs are conflating NEPA's statutory requirement to complete EAs within one year—under which Plaintiffs have brought no claim as to the larger Trinity Risk Reduction Project[8]— with the Forest Service's authority under Section 1b.9(w) to take emergency response actions *now* because "emergency circumstances exist [*now*] that make it necessary to take urgently needed actions before the NEPA process can be completed." 7 C.F.R. § 1b.9(w); *cf.* Pls.' Br. 15 (interjecting the word "reasonably"). The point is that the EA and FONSI for the larger Trinity Risk Reduction Project are not complete *now* and are not expected to be completed until *after* one or two more fire seasons. The Forest Service determined waiting as to these critical 1,200 acres was not in the public interest. That decision, at the time it was made in October 2025, was reasonable and well supported. Under Plaintiffs' reading of the emergency regulations the first line of inquiry would not be—as the regulation states—whether "emergency circumstances *exist*" in the present tense. Instead, the inquiry would consider whether emergency circumstances existed in some form in the past where, if the agency had acted, it could have possibly completed NEPA using the NEPA device (in this case, an EA) of Plaintiffs' choosing. Pls.' Br. 15-16.

Plaintiffs raise Section 40807 of the Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. 117-58, 16 U.S.C. § 6592c, Pls.' Br. 17, but the IIJA isn't the basis for the 1,200-acre emergency

---

[8] The 1-year statutory deadline does not run from sending a scoping letter Plaintiffs say, Pls.' Br. 15-16, but from the sooner of "(i) the date on which such agency determines that section 4336(b)(2) of this title requires the preparation of an environmental assessment with respect to such action; (ii) the date on which such agency notifies the applicant that the application to establish a right-of-way for such action is complete; and (iii) the date on which such agency issues a notice of intent to prepare the environmental assessment for such action." 42 U.S.C. § 4336a(g)(1)(B).

response action; the emergency regulations 7 C.F.R. § 1b.9(w) are. Section 40807 provides for a more streamlined NEPA process, which the Forest Service may employ for the larger Trinity Risk Reduction Project. But Section 40807 does not apply here where the Forest Service is acting under subpart (w) to take urgent action "before the NEPA process can be completed," 7 C.F.R. § 1b.9(w), whether that NEPA process falls under Section 40807 or not.

In sum, the Forest Service reasonably selected 1,200 acres with some of the most dangerous and challenging conditions, close to critical infrastructure and vulnerable rural communities, and where the impact of fuels reduction treatments could have the greatest impact. Plaintiffs have not met their burden to show a likelihood of success as to their NEPA claim.

### b. The Emergency Response Complies with NFMA (Count 2).

At the outset, Plaintiffs are wrong that the Forest Service had to demonstrate or explain its compliance with NFMA or consistency with the forest plan in the Emergency Response Decision Memorandum. The Ninth Circuit has rejected this argument. *Or. Nat. Desert Ass'n*, 957 F.3d at 1033 ("our precedents . . . do not stand for the proposition that the NFMA and the APA, on their own, require the Forest Service to 'analyze and show,' in a contemporaneous written document, that each of its actions conform to the applicable forest plan"); *cf.* Pls.' Br. 18.[9]

It is enough that the Emergency Response *is* consistent with the Shasta-Trinity National Forest Land and Resource Management Plan ("Forest Plan"). The Forest Plan requires the Forest Service to "[m]aintain and/or enhance habitat for [threatened and endangered] species consistent with individual species recovery plans" and "[s]urvey and evaluate habitat for [threatened and endangered] species at the project level in coordination with the USFWS." Dunn Decl., Ex. 24 at 39, Dkt. No. 9-24. The

---

[9] While the 2012 planning rules require the Forest Service to document consistency with applicable Forest Plan standards in its decision document, 36 C.F.R. § 219.15(d), that regulation only applies to projects with forest plans developed or revised after the regulation became effective. *Id.* § 219.17(c) ("None of the requirements of this party apply to projects or activities on units with plans developed or revised under a prior planning rule until the plan is revised under this part."). Here, the governing Forest Plan dates to 1995, making the 2012 planning rules inapplicable. 36 C.F.R. § 219.17(c).

Emergency Response is consistent with these standards and guidelines.[10]

Plaintiffs focus on Recovery Action 10, which they acknowledge is a *recommendation* and not a mandate, Pls.' Br. 18, and therefore no NFMA claim can arise from the Forest Service's alleged violation of that recommendation. Faced with similar allegations regarding the Forest Service's alleged non-compliance with the NSO Recovery Plan in a challenge to the Smokey Project, this court held, "it is clear that the cited sections of the [Recovery Plan] are merely suggestive and do not impose mandatory terms on the USFS." *Conservation Cong. v. United States Forest Serv.*, 235 F. Supp. 3d 1189, 1220 (E.D. Cal. 2017), *aff'd*, 775 F. App'x 298 (9th Cir. 2019); *see also Conservation Cong. v. Heywood*, No. 2:11-CV-02250-MCE-CMK, 2015 WL 5255346, at *1 (E.D. Cal. Sept. 9, 2015), *aff'd*, 690 F. App'x 541 (9th Cir. 2017) ("While useful in evaluating an action's impact on the species' recovery, recovery plan objectives are discretionary for federal agencies.") (internal quotations omitted). Therefore, even if the Emergency Response did not adopt every recommendation from the Recovery Plan, that would not establish inconsistency with the Forest Plan or a violation of NFMA.

In any event, the Emergency Response maintains NSO habitat "consistent" with the recovery plan for that species. Plaintiffs argue the Emergency Response is inconsistent with Recovery Action 10 because it "authorizes logging in occupied NSO territories and cores" and/or the Forest Service "has not demonstrated or explained why this action is necessary to accomplish any recovery objectives." Pls.' Br. 19. Addressing similar allegations in the Smokey Project case, this court held, "the language of Recovery Action 10 is suggestive and framed in a manner that anticipates the balancing of competing goals." *Conservation Cong.*, 235 F. Supp. 3d at 1220. Further, Recovery Action 10 itself acknowledges that "*active forest management may be necessary* to maintain or improve ecological conditions." *Id.* (emphasis added)*; see also Heywood*, 2015 WL 5255346, at *12 ("the [Recovery Plan] does not

---

[10] Plaintiffs do not go on to make any specific arguments about the Forest Service's compliance with the second Forest Plan standard and guideline about surveying and evaluating NSO habitat in coordination with FWS. They have therefore waived any NFMA claim based on that provision, at least at the TRO/PI stage. In any event, as explained in the accompanying Declaration of Tara Jones, the Forest Service has worked with FWS, including several field visits, to survey and evaluate NSO habitat within the emergency response area. Jones Decl. ¶ 45.

recommend forgoing all land management activities to avoid short-term consequences to the NSO, and instead appears to support the proper implementation of projects like this"). Even though the FWS had determined that the Smokey Project was inconsistent with portions of Recovery Action 10, the court found that such inconsistency did not violate NFMA. *Conservation Cong.*, 235 F. Supp. 3d 1189 at 1220 ("The Court cannot read this section to impose mandatory requirements on the USFS and thus it does not find a violation.").

Plaintiffs are also wrong on the facts. Neither sale authorizes commercial harvest in the occupied "cores" and only the Rainier authorizes harvest in an unoccupied core. Jones Decl. ¶ 46. Further, because none of the emergency activities will downgrade NSO habitat (*i.e.*, nesting habitat would remain nesting post-treatment, roosting would remain roosting, and so on), *id.* ¶¶ 44-45, the Forest Service has met its obligation to "maintain" NSO habitat in the Forest Plan and the Emergency Response is not inconsistent with Recovery Action 10's recommendation to "[c]onserve spotted owl sites and high value NSO habitat." Finally, acting now to prevent a catastrophic wildfire from destroying owl nests and habitat later, as occurred in the King Fire, comports with the recommendation.

Plaintiffs again misstate the law when they argue that the agency violated NFMA by failing to "demonstrate[] or explain[] why this action is necessary to accomplish any recovery objectives . . . [or] how the combined effects of the PFERP and the larger Project will be consistent with the Forest Plan requirements around NSOs and habitat." Pls.' Br. 19. There is no such requirement and the case they cite in support merely states the obvious, that "the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

In sum, Plaintiffs have not shown a likelihood of success on their NFMA claim.

**B. Plaintiffs Fail to Demonstrate Imminent Irreparable Injury to Their Interests.**

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. A showing of the "possibility of irreparable harm" is insufficient. *Id.* Issuing a preliminary injunction based only on the possibility of irreparable harm is inconsistent with the characterization of injunctive relief as an extraordinary remedy that may be

19

awarded only upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Although the Court need not consider this element because Plaintiffs have failed to establish any of the other elements necessary for a preliminary injunction, *Winter*, 555 U.S. at 20, it doesn't help them in any event.

Plaintiffs' motion is premised on harm they say the Emergency Response activities will cause to the NSO and its habitat. Pls.' Br. 19-20. Plaintiffs' allegations of harm are speculative and based on incorrect facts. The better evidence shows that the Emergency Response will cause no imminent irreparable injury to the NSO or its habitat and could prevent harm to the species.

The Rainer sale has no units within occupied "core" habitat and the "core" that is occupied within Long Canyon Timber sale area has no timber harvest units identified. Jones Decl. ¶ 46; *cf.* Pls.' Br. 20 ("[t]hree occupied owl nest cores and surrounding habitat are overlapped by the Timber sales"). As to the entire Emergency Response area, the Forest Service has worked with FWS to develop and implement specific measures and prescriptions to protect the NSO. Jones Decl. ¶¶ 25, 32, 34, 36. Neither sale will downgrade NSO habitat and the specific treatments that will be employed as part of the Emergency Response were designed to minimize disturbance. *Id.* ¶¶ 44-45, 61.

Plaintiffs emphasize the "procedural harms" they would suffer if the timber sales are allowed to continue, but procedural harms alone, without any demonstration of harm to their concrete interests, are not enough to support a finding of irreparable harm. *Nevada v. United States*, 364 F. Supp. 3d 1146, 1152-53 (D. Nev. 2019) (agreeing with the Government that "opportunity to comment is merely procedural harm and therefore cannot support a finding of irreparable harm" and relying on *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531 (1987)). Further, all the process they claim was due to them either does not apply in emergencies under 7 C.F.R. § 1b.9(w) or relates to the still-unfinished Trinity Risk Reduction Project. Subpart (w) does not require "draft or final NEPA documents" or "public engagement" before authorization of the emergency response (Pls.' Br. 21).

In sum, Plaintiffs have failed to show irreparable harm to their interests in the absence of an injunction. In the alternative, even if irreparable harm to Plaintiffs were possible, the injunction they seek—against the two sales in their entirety—is overbroad in that it includes non-habitat units and

20

roadside units for ingress/egress to Long Canyon and Lake Forest Estates for which the risk of irreparable harm to the public is so great that those units should not be enjoined.

### C. The Balance of Equities and the Public Interest Favor Defendants.

Because Plaintiffs fail to show a likelihood of success on the merits, the Court need not address the public interest factors. *Winter*, 555 U.S. at 20. Should the Court consider these factors, they strongly favor allowing the ongoing sales to proceed. Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief [and] [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences." *Id.* at 24 (citations omitted). Those two inquiries merge with respect to the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Injunctive relief turns on the public interest writ large, not the plaintiffs' particular preferences, even when their concerns are expressed in environmental terms. *McNair*, 537 F.3d at 1005 ("[W]e decline to adopt a rule that any potential environmental injury automatically merits an injunction").[11]

The Emergency Response actions address the urgent need to mitigate wildfire and public safety risks created by the dangerous combination of frequent recent fires, dense forests, high surface and ladder fuels, challenging terrain and proximity to wilderness, isolated communities, and critical infrastructure. Addressing these risks is in the public interest because it could save lives and homes that would otherwise be lost while the Forest Service completes the NEPA process for the larger Trinity Risk Reduction Project. *Conservation Cong. v. U.S. Forest Serv.*, 774 F. App'x 364, 368 (9th Cir. 2019) (affirming district court's denial of injunctive relief and its finding that "steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing public roads, and in mitigating the intensity and severity of future fires outweighs the public interests that support an injunction." (internal

---

[11] Plaintiffs are wrong when they say, "to avoid a TRO, Defendants must demonstrate that the specific activities sought to be enjoined—intensive logging operations within NSO nesting, roosting, and foraging habitat—are so essential for fire mitigation that such operations outweigh all other interests." Pls.' Br. 23. A TRO does not create a presumption the Government must rebut. When seeking preliminary relief, the movant "carries the burden of proof on each element of either test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

citations omitted)). Where, as here, so many benefits flow from a project, enjoining that project is not in the public interest. *See, e.g.*, *Earth Island Inst. v. Carlton*, No. Civ. S-09-2020 FCD/EFB, 2009 WL 9084754, at *28 (E.D. Cal. Aug. 20, 2009), *aff'd*, 626 F.3d 462 (9th Cir. 2010) (issuance of injunction would not be in public's interest because defendants offered evidence that if the project did not proceed, "the public w[ould] lose the benefits of the reforestation efforts, which w[ould] expedite forest regeneration, recover forested conditions, prevent domination of shrub species, and repair habitat structure for wildlife").

Any delay of the Emergency Response activities would jeopardize the contractors' ability to complete the contracted-for work before the termination of the contracts on January 31, 2026 and February 1, 2026, respectively. Due to seasonal restrictions on fuel reduction treatments, this work could not resume until after the next fire season next fall. Jones Decl. ¶ 63. Nearby communities like Lake Forest Estates and Long Canyon, which would have benefited from reduced wildfire risk and safe exit routes from the Emergency Response, will remain as they are today—extremely vulnerable to catastrophic wildfire through another fire season. Although Plaintiffs speculate that it would be good enough for some fuels reduction activities (outside the two commercial sales) to move forward, Pls.' Br. 22-23, the commercial work is integral to the Emergency Response and without it the fire mitigation benefits of the Emergency Response cannot be realized. Jones Decl. ¶¶ 59-61.

A Court order delaying the emergency response activities would also result in immediate and certain financial harm to the Forest Service. Although money damages are not dispositive, an injunction could require the Forest Service to pay contractors funds it could use for other work, which coupled with the loss of the complete Emergency Response effort, harms the public interest. The Forest expects to collect approximately $357,073 in receipts from the Rainier sale and approximately $235,097 in receipts from the Long Canyon sale. Decl. of Kori Kelly ("Kelly Decl.") ¶¶ 4-5. If the Court were to order a preliminary injunction, the Forest Service would need to suspend both contracts, and the agency could be liable to the purchasers for liquidated damages caused by the delay under the contract. *Id.* ¶ 9. These damages could reach upwards of $400,000 for both contracts combined if the duration of the preliminary injunction suspension exceeds either six months of normal operating season (April 1 to November 30)

time, or one calendar year from the date of the suspension order, *id.*, which would likely be the case here where the parties are in the preliminary stages of litigation. Even if the Court were only to enjoin the sales for a shorter duration through a TRO, the purchasers may still be entitled to claim damages for delay or interruption of operations caused by the Forest Service's short-term suspension of the contracts, including equipment costs. *Id.* ¶ 8. Such claims could be between $10,000 and $25,000. *Id.* These figures do not account for the delay in achieving much-needed fuels reduction in this critical area— which could extend further into the future if the contractors terminate the contracts and the Forest Service must re-bid the sales—or the loss of jobs and income to the local community. *Id.* ¶ 10. As discussed in the preceding section, the relative harms to Plaintiffs' interests by comparison, if any, are speculative.

In sum, Plaintiffs have not established that the balance of equities or the public interest favor enjoining the emergency response activities, which are already underway. Nor have Plaintiffs shown that the hardship balance "sharply" favors an injunction halting activities which could prevent the future loss of homes and lives to wildfire and that would inflict financial harm on the agency. Further, enjoining the Emergency Response risks harm to the very resources Plaintiffs seek to protect—NSOs and their habitat. Jones Decl. ¶¶ 21, 61. The Court should deny the motion. *Winter*, 555 U.S. at 20; *Cottrell*, 632 F.3d at 1131-32.

## PLAINTIFFS MUST POST A BOND

Although Plaintiffs have not met their burden to show entitlement to emergency injunctive relief, if the Rainier and Long Canyon sales are restrained, the Court should require Plaintiffs to post a bond in the amount of $5,000 for a TRO and $50,000 for a preliminary injunction, which is only some of the financial losses the agency will incur either way. Federal Rule of Civil Procedure 65(c) preconditions the issuance of a restraining order on "the movant giv[ing] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The posting of a bond is a precondition to the issuance of an injunction, regardless of the identity of the plaintiff. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125-26 (9th Cir. 2005) ("So long as a district court does not set such a high bond that it serves to

thwart citizen actions, it does not abuse its discretion."). Plaintiffs have not shown they cannot post a bond.

The damages to the Forest Service (and the public interest) are real. Whereas benefits from the Emergency Response cannot be quantified, the financial harm to the agency from an injunction can be quantified and is likely to climb quickly given the short operating period, the impending termination dates of the contracts, the contractual provisions for liquidated damages, and the anticipated period of an injunction should the court issue one. *See generally* Kelly Decl.

Plaintiffs' assets should be considered collectively in assessing a bond. *Cal. Nat. Res. Agency v. Ross*, No. 1:20-CV-00426-DAD-EPG, 2020 WL 2404853, at *21 (E.D. Cal. May 11, 2020) (requiring $1,000 bond when plaintiffs consisted of a coalition of environmental groups and the State); *United Farm Workers v. Perdue*, No. 1:20-cv-01452-DAD-JLT, 2020 WL 6318432, at *17 (E.D. Cal. Oct. 28, 2020) (requiring $1,000 bond); *Save Our Sonorans*, 408 F.3d at 1126 (affirming the district court's $50,000 bond against an environmental organization). If the Court concludes that injunctive relief is warranted, the Court should require Plaintiffs to post a security in an amount appropriate to pay costs and damages, should the projects be wrongfully enjoined.

The most recent publicly available IRS 990 forms show that Plaintiffs Klamath Forest Alliance, Conservation Congress, the Environmental Protection Information Center, and Safe Alternatives for our Forest Environment together have sufficient financial resources to post a bond. Plaintiff Environmental Protection Information Center ("EPIC") earned $322,006 in revenue and had $445,279 in net assets in 2023. Decl. of Erika Danielle Norman Ex. 1. Conservation Congress's 2022 Form 990EZ shows it earned $130,963 in revenue and had $91,375 in net assets in 2022. *Id.* Ex. 2. Plaintiff Safe Alternatives for our Forest Environment filed a Form 990-N in 2024 indicating it had gross receipts that did not exceed $50,000, *id.* Ex. 3, however, it has not shown it could not contribute anything towards a bond. [12]

---

[12] According to the IRS Tax Exempt Organization Search, the last available Form 990-N for Klamath Forest Alliance was filed for 2017—seven years ago—indicating it had gross receipts not exceeding 50,000. Norman Decl. Ex. 4. If it is indeed the case that this Plaintiff failed to provide the Government with the required tax form for the better part of a decade, then absent current information on its inability to contribute to a bond, it should not benefit from an inference drawn from outdated information.

Plaintiffs' conclusory statements in their brief and declarations about their inability to post a bond, *see*, *e.g.*, Pls.' Br. 24-25, are readily contradicted by publicly available information about their considerable financial assets.

Plaintiffs should have to post a bond in the amount of $5,000 for a TRO and $50,000 for a preliminary injunction.

## CONCLUSION

The Court should deny Plaintiffs' combined motion for a TRO/preliminary injunction because they have failed to show a likelihood of success on the merits or irreparable harm to their interests from the continued implementation of the Long Canyon and Rainier sales and the public interest weighs strongly in favor of letting this critical emergency work continue during the limited operating window. If the Court grants Plaintiffs' motion, Plaintiffs should have to post a bond. There is no question the Forest Service will incur substantial financial costs from the delay Plaintiffs ask the Court to impose and at least two of the four Plaintiffs have assets to support a bond.

Dated: December 4, 2025

ADAM A.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Erika Danielle Norman*
ERIKA DANIELLE NORMAN
Senior Trial Attorney
Natural Resources Section
150 M Street NE, Suite 2.900
Washington, DC 20002
Ph: 202-532-3143 (Norman)
erika.norman@usdoj.gov

*Attorneys for Defendants*

25