Meriel L. Darzen (OR Bar No. 113645)
(503) 525-2725 | meriel@crag.org
Oliver J. H. Stiefel (OR Bar No. 135436)
(503) 227-2212 | oliver@crag.org
Kelsey Y. Dunn (OR Bar No. 244709)
(503) 234-0788 | kelsey@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, OR 97214
LEAD COUNSEL
*Applicants Pro Hac Vice*

Thomas E. Wheeler (CA Bar No. 304191)
(707) 446-9027 | tom@wildcalifornia.org
ENVIRONMENTAL PROTECTION INFORMATION CENTER
145 G. Street, Suite A
Arcata, CA 95521
LOCAL COUNSEL

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KLAMATH FOREST ALLIANCE**, a California non-profit corporation, **CONSERVATION CONGRESS**, a California non-profit corporation, **ENVIRONMENTAL PROTECTION INFORMATION CENTER**, a California non-profit corporation, and **SAFE ALTERNATIVES FOR OUR FOREST ENVIRONMENT**, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> **TARA JONES**, in her official capacity as District Ranger of the Weaverville Ranger District, **RACHEL BIRKEY**, in her official capacity as Forest Supervisor of the Shasta-Trinity National Forest, **JACQUELINE BUCHANAN**, in her official capacity as Acting Regional Forester of the Pacific Southwest Region, **TOM SCHULTZ**, in his official capacity as Chief of the U.S. Forest Service, and the **UNITED STATES FOREST SERVICE**, <br><br> Defendants. | No.  2:25–cv–03424–DMC <br><br> **REPLY IN SUPPORT OF COMBINED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| D | Dispersal Habitat |
| dbh | Diameter at breast height |
| Defendants | Tara Jones, Rachel Birkey, Jacqueline Buchanan, Tom Shultz, United States Forest Service |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| EO | Executive Order |
| ESD | Emergency Situation Determination |
| F | Foraging Habitat |
| Forest | Shasta-Trinity National Forest |
| Forest Service | United States Forest Service |
| LOP | Limited Operating Procedure |
| N | Nesting Habitat |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NR | Nesting/Roosting Habitat |
| NRF | Nesting/Roosting/Foraging Habitat |
| NSO or Owl | Northern Spotted Owl |
| NWFP | Northwest Forest Plan |
| Plaintiffs or KFA | Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, Safe Alternatives for our Forest Environment |
| Project or North Trinity Project | North Trinity County Community Risk Reduction Project |
| R | Roosting Habitat |
| Service | United States Fish and Wildlife Service |
| SM | Secretarial Memo |
| USDA | United States Department of Agriculture |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLS.' Reply ISO TRO/PI - ii

**INTRODUCTION**

The Forest Service's intent here is laudable but its method is flawed. Despite having several pathways to reach a speedy, legally defensible final decision that would allow it to proceed expeditiously, it has chosen to push its regulations beyond their reasonable limits. And therein lies the problem: an agency's interpretation of its own regulations must be reasonable. By Defendants' account, any wildfire mitigation project anywhere in the state of California, or elsewhere, may proceed before NEPA is completed. That cannot be the law. It is not news that California experiences severe wildfires—the issue has been front and center for Californians for over a decade, as is explained in Defendants' report. ECF No. 18-3 at 5 (largest wildfires have occurred since 2012, 2020 was "unprecedented"). But Defendants have never before used this type of emergency procedure to avoid NEPA for an ordinary commercial logging project when no fire was burning, or had burned the area to be treated. They should not be able to start now.

A TRO is needed now because Plaintiffs' members, who live directly adjacent to and recreate regularly in the units being logged and who were cut completely out of this process, are currently experiencing irreparable harm as a result of the logging. As set forth below, in addition to offering an unreasonable interpretation of the law, Defendants are not being forthcoming about what is happening on the ground—cutting is occurring in NSO territories contrary to expert agency recommendations. While the benefits are speculative (as Defendants admit), the harm cannot be reversed. Finally, as this is the first time this regulation has been interpreted and applied, it warrants a status quo injunction so this court can benefit from a full record before addressing the meaning of the regulation in the first instance.[1]

**ARGUMENT**

I.    **Plaintiffs Are Likely to Succeed on the Merits.**

    A.    **The Forest Service's Interpretation of 7 C.F.R. § 1b.9(w) is Unreasonable Because it Would Allow Any Wildfire Mitigation Project, Regardless of Time or Scope, to Avoid Pre-Project NEPA.**

---

[1] Indeed, Defendants rely principally on a 64-paragraph, post-decisional declaration, rather than the actual record. But it is a "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020).

PLS.' REPLY ISO TRO/PI - 1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1

2       The Parties agree that the plain language of 9(w) controls; Defendants make no appeal to

3  deference to an ambiguous regulation. Applying *Kisor v. Wilke*, 588 U.S. 558, 575 (2019),

4  Defendants' interpretation fails.

5       At base, an agency's interpretation of its regulation must be reasonable. *Maceren v. Dist.*

6  *Dir., Immigration & Naturalization Serv.*, 509 F.2d 934, 941 (9th Cir. 1974). "And let there be no

7  mistake: That is a requirement an agency can fail." *Kisor*, 588 U.S. at 576. Here, the Forest

8  Service's interpretation of 9(w) goes beyond reasonableness. Defendants argue that 9(w) allows

9  them to defer both of NEPA's "twin aims" (public participation and consideration of

10 environmental consequences) in essentially any circumstance under the guise of it being an

11 emergency regardless of whether that circumstance arose years ago, now, or has yet to arise. That

12 reading defies the limits of what is permitted under 9(w) under either its ordinary meaning or its

13 regulatory definition.[2]

14      Under Defendants' interpretation, the "emergency circumstances" required by 9(w) have

15 no temporal limit. Defendants affirmatively posit that "there is <u>no option period</u> during which the

16 Forest Service must act once 'urgent circumstances' present themselves or else be shut out of its

17 authority under subpart (w)." Resp. at 15, ECF No. 18 (emphasis added). And in this case, the

18 agency apparently took that to heart—admitting that Plaintiffs are correct that fire risk was high

19 in prior years, as it is now, and that the North Trinity Project was scoped a year ago, but arguing

20 that is irrelevant for the purposes of 9(w). *Id.* at 15–16.[3]

21      Defendants further argue that it makes no difference that they had started a NEPA process

22 for this exact project and this exact purpose to address these exact circumstances over a year ago,

23

24           [2] As discussed below, Defendants lean into the new definition of "emergency" as not requiring any sudden
25  or unforeseen circumstances, but the regulation still has temporal limits: "emergency circumstances exist that make it
    necessary to take urgently needed actions before the NEPA process can be completed." 7 C.F.R. § 1b.9(w).
26           [3] Defendants are wrong when they claim that emergency circumstances created by floods, fires, landslides,
    and the like are only applicable under on section of the regulations. Resp. at 14. Floods, fires, landslides are the
27  emergency. 220.4(b)(1) and 9(v) allow actions to control the "immediate" impacts caused by those events.
    220.4(b)(2) and 9(w) allow "urgent" actions—also to "address the underlying emergency." 73 Fed. Reg. 43,084,
28  43,088 (July 24, 2008). There is no support for the proposition that the different sections apply to different types of
    emergencies altogether.

PLS.' REPLY ISO TRO/PI - 2

because they simply will not be completing that NEPA process in the near future. Resp. at 16. Finally, Defendants' declarant, Defendant Jones, admits that it is only "possible" that the PFERP "could" prevent losses. ECF No. 18-1 at 23.

Taken together, these positions result in an unreasonable interpretation of 9(w): the emergency can have happened at any time in the past or could happen in the future, the agency could have proposed the responsive actions (which may or may not remedy the situation) at any other time in the past, and yet at any later point in the future, they can still skip NEPA and go directly to implementation. In fact, this means that if, as Defendants claim, Resp. at 6, California's forests are in a "state of emergency," then the Forest Service could simply use 9(w) for any forest management project on the 20 million acres of National Forest System lands in the State, or even across the entire 115 million acres that are subject to the Secretarial Memo. See https://www.fs.usda.gov/main/r5/about-region (last visited Dec. 4, 2025); *see also* Resp. at 7 (arguing that the situation facing California's forests—writ large—requires "urgent action"); ECF No. 9-10 (Sec. Memo.). This is patently unreasonable. *Env't Prot. Info. Ctr. v.* Carlson, 968 F3d 985, 991 (9th Cir. 2020) (rejecting Forest Service's overbroad and unreasonable interpretation of its own regulations).

Even assuming Defendants' expansive definition of emergency to include potential future events, the agency's rationale does not stand for the PFERP. Here the "emergency" claimed by the Forest Service is a possible wildfire in 2026 or 2027. *See* ECF No. 9-15 at 1 ("threat of wildfire well into the next several fire seasons"). But under the plain text of Section 9(w), the agency must show that it could not have and cannot complete NEPA review in time to implement actions in advance of that timeframe. 7 C.F.R. § 1b.9(w) ("an emergency exists that makes it necessary to take urgently needed actions **before the NEPA process can be completed."**) (emphasis added). Here, the agency provides no explanation for why it did not and cannot do so here, instead just stating that it did not and will not. ECF No. 18 at 16 (North Trinity EA not expected to be completed until after one or two more fire seasons).

The North Trinity Project was scoped in November of 2024, and the Forest Service disclosed that it would be preparing an EA. ECF No. 9-3. The Forest Service is required by

PLS.' REPLY ISO TRO/PI - 3

1  statute to finalize an EA within one year, 42 U.S.C. § 4336a(g)(1)(B), meaning it should have

2  completed the NEPA process by now.[4] Clearly, the agency prioritized the PFERP and

3  advertisement of the Rainier and Long Canyon timber sales over its NEPA process. It is unclear

4  how such intentional prioritization satisfies the requirement of 9(w) that actions are needed before

5  the NEPA process can be completed.

6       Moreover, the Swift Complex did not alter the basis for the claimed emergency. As the

7  PFERP explains, there have been a series of wildfires in this general area over the last five years,

8  ECF No. 9-15 at 2, giving the agency ample time to complete a NEPA process for a fuels

9  reduction project well before the summer of 2026 or 2027. Indeed, PFERP cites the 2021 Dixie

10  Fire as a basis for the urgently needed activities. ECF No. 9-15 at 2. If such conditions were

11  known to the agency as early as 2021, surely the agency could have completed a NEPA process

12  to allow for actions to take place before the summer of 2026 or 2027. And finally, Defendants' set

13  of reasons for why 9(w) applies here are the same justifications for doing the North Trinity

14  Project – the Venn diagrams are concentric circles. Compare Decl. Dunn, Ex. 4 at 6 (identifying

15  and describing proposed actions including FMZ) with Decl. Dunn, Ex. 15 at 3 (describing fuels

16  reductions treatments including FMZ). In sum, the Forest Service is applying an unreasonable

17  interpretation of 9(w), and has not demonstrated that the PFERP is satisfies the requirements of

18  the plain text of Section 9(w).

19       **B.**    **The Previous and Current Versions of the Regulation are Substantively the Same, But if They are Not, the New Regulation Violates the APA and NEPA.**

20

21       The language of 9(w) and the prior version, 36 C.F.R. § 220.4(b)(2) are substantially

22  similar. Both address the use of "alternative arrangements" to address "urgent but not immediate

23  actions." *Compare* 7 C.F.R. § 1b.9(w) with 36 C.F.R. § 220.4(b)(2). Relying on a new definition

24  of "emergency," Defendants argue that the scope of 9(w) is broader than 36 C.F.R. § 220.4(b)(2),

25  such that the regulatory history of the latter is immaterial to resolving the proper interpretation of

26

27      [4] The Forest Service decided as early as November 18, 2024 in its Scoping Notice that an EA was required. ECF No. 9-3 at 1. If the agency actually had determined **earlier** that an EA was required, then the agency's

28  invocation of 9(w) and failure to complete the EA is all the more troubling. *Contra* Resp. at 16 n. 8.

PLS.' REPLY ISO TRO/PI - 4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    the former. Resp. at 15. The rulemaking record does not support that position. But if 9(w) is

2    indeed broader the 220.4(b)(2), then the agency has violated one of the core tenants of the APA:

3    the failure to adequately support its change in position.

4        Nothing in the preamble to the Interim Final Rule adopting 9(w) suggests that the

5    Department intended to make any substantive changes to agency-specific emergency regulations

6    like the Forest Service's prior version. In fact, just the opposite is true. *See* 90 Fed. Reg. 29,632,

7    29,644 (July 3, 2025) (explaining that the changes from 220.4(b)(2) to 9(w) were minor,

8    involving only (1) the elimination of "language regarding categorical exclusions, environmental

9    assessments, and findings of no significant impact as this discussion is now covered for all USDA

10   agencies"; and (2) the use of "more generalized language about the process for approving

11   alternative arrangements for emergency actions not anticipated to have reasonably foreseeable

12   significant effects given the ongoing organizational restructuring at USDA that could affect office

13   names and staff position titles."). Indeed, the "concept" of emergency actions under agency-

14   specific regulation was expressly "carried forward into the USDA NEPA regulations for

15   'immediate actions' and 'urgent but not immediate actions.'" *Id.* at 29,639. Accordingly, the

16   guidance surrounding the adoption of 220.4(b)(2) remains instructive, as does caselaw

17   interpreting it. The language of the preamble to 220.4(b)(2) confirms that only actions responsive

18   to bona fide emergency circumstances were covered under the regulation. *See* Memo at 16–17,

19   ECF No. 9. The application of 9(w) to proactive actions to address a future emergency is

20   therefore unreasonable.

21       If, however, the USDA did in fact substantively change 9(w), then the agency has violated

22   the APA and NEPA. As the Supreme Court has instructed, a threshold requirement for an

23   agency's policy change to pass muster under the APA is that the agency must "display awareness

24   that it is changing position" because "[a]n agency may not . . . depart from a prior policy *sub*

25   *silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "Unexplained

26   inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change

27   from agency practice under the [APA]." *Nat'l Cable & Telecommunications Ass'n v. Brand X*

28   *Internet Services*, 545 U.S. 967, 981 (2005). According to the Ninth Circuit, a policy change

PLS.' REPLY ISO TRO/PI - 5

complies with the APA only if

> the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (citing *Fox TV*, 556 U.S. at 515–16. The USDA has satisfied **none** of these requirements. Further, the new regulation is at odds with NEPA's intent and purpose. *Cf. U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1135 (9th Cir. 2011) ("[A]dministrative agencies . . . are creatures of statute, bound to the confines of the statute that created them[.]").

Because the interpretation of 9(w) as covering the circumstances here clearly fails *Kisor*'s test, structure, history, and purpose framework, *see* Section I.A, *supra*, Plaintiffs have focused their TRO/PI briefing on this aspect of their Complaint. *See* ECF No. 1 (Claim 1, Count 1). However, if, at this stage of the litigation, this Court is inclined to agree with Defendants that the scope of 9(w) is broader than 220.4(b)(2), then Plaintiffs will bring forward their as-applied challenge to 9(w) itself, *see* ECF No. 1 (Claim 1, Count 2), including that 9(w) represents an arbitrary change in position under *Fox TV* and *Kake*, and that, as applied, the new regulation violates NEPA.

### C. The Regulation's Context with the IIJA's Section 40807 Shows that it Should Not Be Construed More Broadly Than Section 40807.

Defendants in their Response failed to address the argument that its interpretation renders Congress' adoption of Section 40807 in the IIJA meaningless. *See Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1442 (9th Cir. 1990) ("In discerning the meaning of regulatory language, [a court's] task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme, and not to give force to one phrase in isolation."). Defendants argue, Resp. at 16-17, that Section 40807 (and by extension the SM) do not apply, but the conditions to justify application of Section 40807 are the exact same as the stated basis for 9(w) here. *See* ECF No. 19-15 at 2 (PFERP, citing the SM). By claiming that the agency can bypass NEPA completely to

PLS.' REPLY ISO TRO/PI - 6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

address the exact same circumstances that justified the application of Section 40807 swallows that provision completely. If the Forest Service could apply 9(w) in any situation covered by Section 40807 and the Secretary's Memorandum, then the agency could use "alternative arrangements" for NEPA compliance anywhere in the 112 million acres of national forest system land covered by the SM. This Court should not sanction such an absurd result. *See Maceren*, 509 F.2d at 941 (courts should reject interpretations which produce an unjust, unreasonable, or absurd result").

### D.    Caselaw Confirms that Section 9(w) Must be Read More Narrowly.

As has been consistently interpreted by the courts, the Forest Service's regulatory emergency powers address situations responsive to emergency conditions. As the courts have held, once the emergency conditions (like a fire) are under control, the agency has a duty to comply with the ordinary procedures and cannot avail itself of alternative arrangements. *See* Memo at 17–18.

Defendants cited cases are distinguishable. They rely on *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, No. 2:16-cv-0293-TOR, 2017 WL 2962771, at *4 (E.D. Wash. July 11, 2017), *aff'd*, 726 F. App'x 605 (9th Cir. 2018), but that case involved a **fire that was currently burning**.

Defendants also cite *Earth Island Inst. v. Pengilly*, 376 F. Supp. 2d 994, 1008–09 (E.D.Cal. 2005), aff'd in part sub nom; *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687 (9th Cir. 2007), rev'd on other grounds sub nom; *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); and *Siskiyou Reg'l Educ. Project v. Goodman*, 2005 WL 2083011, at *7 (D. Or. July 29, 2005) but those cases dealt with the term "emergency" under a completely different regulation. The now-defunct 36 C.F.R. § 215.2 previously allowed the Forest Service to bypass the required administrative appeal process under certain circumstances deemed an emergency under that regulation. But this meant that the Forest Service **still had to complete its NEPA process** and issue a final decision before it started implementing the project–only the post-decisional appeals process could be skipped. That regulation was more akin to Section 40807, which allows the agency to bypass the pre-decisional administrative objection process otherwise required by 36

PLS.' REPLY ISO TRO/PI - 7

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    C.F.R. Part 218 (which replaced 36 C.F.R. Part 215). Under Section 40807, as discussed, the

2    Forest Service before implementation must complete an (albeit streamlined) NEPA process; it

3    cannot simply begin implementation prior to a final decision. Clearly, the term "emergency"

4    under 36 C.F.R. § 215.2 and Section 40807 must be interpreted differently than under 9(w),

5    because the two different schemes involve an entirely different process.

6        In sum, the PFERP does not qualify for Section 9(w), and the Forest Service's proposed

7    interpretation of the regulation is unreasonable.

8        **E.    The Forest Service Has Violated NFMA by failing to demonstrate that the
          PFERP Is Consistent with the Shasta-Trinity National Forest Plan.**

9

10       Defendants argue that the Forest Service did not have to demonstrate consistency with the

11   Forest Plan. Resp. at 17 (citing *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024 (9th

12   Cir. 2020) ("*ONDA v. USFS*")). *ONDA v. USFS* did not so hold; Defendants' position cuts against

13   Ninth Circuit precedent, Supreme Court precedent, and the statute itself.

14       16 U.S.C. §1604(i) plainly requires that all site-specific projects must be consistent with

15   the governing forest plan. Interpreting this statutory provision, the Supreme Court held that,

16   "[b]efore the Forest Service can permit logging, it must . . . "ensure that the project is consistent

17   with the [forest plan]." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729–30 (1998). And as

18   the Ninth Circuit has consistently held, the agency "must support its conclusions that a project

19   meets the requirements of the NFMA and relevant Forest Plan with studies that the agency, in its

20   expertise, deems reliable. The Forest Service must explain the conclusions it has drawn from its

21   chosen methodology, and the reasons it considers the underlying evidence to be reliable." *Lands*

22   *Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc); *see also All. for the Wild Rockies*

23   *v. U.S. Forest Serv.*, 907 F.3d 1105, 1113 (9th Cir. 2018) (agency must articulate a "rational

24   explanation" in demonstrating a project's consistency with forest plan).

25       The court in *ONDA v. USFS* rejected a "procedural" NFMA challenge: The absence of a

26   document memorializing a site-specific project's consistency with the forest plan, is not itself

27   arbitrary and capricious. 957 F.3d at 1034; *see also id.* ("In other cases interpreting the NFMA,

28   we have held that we may not impose procedural requirements not explicitly enumerated in the

PLS.' REPLY ISO TRO/PI - 8

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1   pertinent statutes.") (citations omitted). But where, as here, a substantive violation of NFMA is

2   alleged, courts review NEPA-mandated documentation in determining whether the agency has

3   complied with its obligation to ensure a project's consistency with the applicable forest plan. *See*

4   *id.* 1034 (collecting cases). Reviewing a substantive NFMA challenge, the Ninth Circuit in *ONDA*

5   *v. USFS* satisfied itself that the agency action complied with the applicable forest plan provisions

6   by engaging in a fulsome review of the administrative record. *Id.* at 1035–37; *see also Native*

7   *Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005) (Forest Service must

8   provide a "satisfactory explanation supported by the record showing the necessary rational basis"

9   for its conclusions).

10      Here, however, Defendants simply ask this Court to defer to agency counsel's post-hoc

11   rationalizations of NFMA consistency. Resp. at 17 ("It is enough that the [PFERP] *is* consistent

12   with the [Forest Plan]."). The PFERP says nothing about the owl, let alone consistency with the

13   Forest Plan's provision regarding the owl. That should be sufficient to find a NMFA violation on

14   its face because courts may not "defer to a void." *Or. Nat. Des. Ass'n v. U.S. BLM*, 625 F.3d

15   1092, 1121 (9th Cir. 2010). Whether or not courts found **other** projects consistent with the forest

16   plan is immaterial.

17      The sole factual basis offered by Defendants for alleged Forest Plan consistency—relying

18   on a self-serving declaration prepared by Defendant Jones—is that neither sale authorizes logging

19   in occupied cores and that each sale maintains NSO habitat. Resp. at 19. But these allegations

20   have not been reviewed by the expert agency—the Service. *Cf. Barnes v. U.S. Dep't of Transp.*,

21   655 F.3d 1124, 1137 (9th Cir. 2011) ("[T]he agencies would like this court to take their word for

22   it and not question their conclusory assertions * * * their word, however, is not entitled to

23   significant deference that courts give [agency methodologies].").

24      In the ordinary course, the Forest Service must complete Endangered Species Act

25   ("ESA") Section 7 consultation with the U.S. Fish and Wildlife Service ("Service") before

26   implementing logging operations in and around owl habitat. 16 U.S.C. § 1536(a)(2). During that

27   process, the Service reviews documents, maps, and other information, and for actions that may

28   affect and are likely to adversely affect an ESA-listed species like the owl, formulates its

PLS.' REPLY ISO TRO/PI - 9

biological opinion—based on the best available commercial and scientific information—as to whether the action, taken together with cumulative effects,[5] is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. 50 C.F.R. § 402.14(g)(4). For a recent logging project on the Shasta-Trinity National Forest, the Service during the course of ESA Section 7 consultation independently verified the Forest Service's characterizations of NRF habitat within the project area. ECF No. 9-1 at 13. The Service ultimately determined that the Forest Service had **mistyped** NRF habitat, including by labeling certain nesting and roosting habitat as "non-habitat." *Id.* at 43–44.

Here, however, the Forest Service's NSO habitat characterizations have not been reviewed by the Service because the Forest Service has simply skipped pre-implementation Section 7 consultation. Defendants admit that that 48% of the area covered by the PFERP comprises NSO suitable habitat, ECF No. 18-1 ¶ 44, and this number may be higher after a refinement of habitat typing. While Defendants contend that NRF will be maintained, again, this conclusory assertion has not been vetted by the expert agency. And while Defendants attempt to minimize the impacts to NSO on grounds that the heaviest activities will occur in a currently unoccupied, Resp. at 19, the Recovery Plan does not distinguish between occupied/unoccupied and instead focuses on conserving high-quality habitat. ECF No. 9-2 at 82 (Recovery Action 10), 106 (Recovery Action 32). On the current record, there is simply no basis to find consistency with Forest Plan provisions incorporating the NSO Recovery Plan.

## III.    An Injunction Is Necessary to Avoid Irreparable Harm.

If commercial logging operations are not enjoined, well over 5,000 "large" trees—according to the Forest Service's own methodology—will be cut. *See* ECF No. 18-1 at 24. Plaintiffs have testified to the fact that this logging of mature forests will irreparably harm their interests. ECF No. 6-3 ¶¶ 9–12, 14; 6-4 ¶¶ 11–12; 6–5 ¶ 15; 6-3 ¶¶ 4–5, 10; 6-7 ¶¶ 19–21. This is more than sufficient to establish irreparable harm under Ninth Circuit precedent. *League of*

---

[5] Because this area is checkerboarded with private timberlands, analyzing the cumulative effects of private land logging along with logging on Federal land is critical as many of the NSO territories cross into private lands and have thus lost substantial habitat where clearcutting has removed all of the standing forests. See 2d Decl. Darzen, ¶ X (google earth image showing comparison of private lands adjacent to the Rainier sale area).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    *Wilderness Defs. v. Connaughton* ("*LOWD*"), 752 F.3d 755, 764 (9th Cir. 2014) ("[T]he logging

2    of mature trees . . . is irreparable for the purposes of the preliminary injunction analysis."); *Env't.*

3    *Prot. Info. Ctr. v. Carlson* ("*EPIC*"), 968 F.3d 985, 991 (9th Cir. 2020) ("Ongoing harm to the

4    environment constitutes irreparable harm warranting an injunction."); *Cottrell*, 632 F.3d at 1135

5    ("[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages

6    and is often permanent or at least of long duration, *i.e.*, irreparable.").

7         This irreparable environmental injury is coupled with demonstrated procedural harm from

8    the misapplication of 9(w). *See, e.g.*, ECF No. 6-7 ¶ 23. Where procedural harm is linked with

9    environmental injury, as here, courts have had no trouble finding irreparable harm. *Sierra Club v.*

10   *Eubanks*, 335 F. Supp. 2d 1070, 1083 (E.D. Cal. 2004) (logging in contravention of

11   environmental laws usually "is enough in and of itself to satisfy the irreparable harm component"

12   of an injunction, as "once trees are removed from the landscape, they cannot be replaced.");

13   *accord W. Watersheds Proj. v. Bernhardt*, 391 F. Supp. 3d 1002, 1022 (D. Or. 2019); *Save*

14   *Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2019)[6]

15        Defendants try to deflect from this clear standard by arguing that Plaintiffs must prove

16   irreparable harm to the NSO. Resp. at 20. There are multiple problems with this argument. For

17   one, the standard requires a showing of irreparable injury to a **plaintiff**. *All. for the Wild Rockies*

18   *v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (crediting harm to plaintiffs' ability to "view,

19   experience, and utilize" the forest in its undisturbed state). Here, the contracts involve logging

20   operations in at least 284 acres of NRF habitat, ECF No. 18-1 ¶ 44 (and likely more, *see* Section

21   I.C., *supra*), and Plaintiffs have demonstrated credible concerns about the impacts to owls. ECF

22   No. 6-7 ¶¶ 18–21; *cf. Native Ecosystems Council*, 334 F. Supp. 3d at 1133 (finding irreparable

23   harm from reduction in old growth forest that could harm threatened species). Defendants'

24   allegations regarding an absence of harm to NSO rests solely on the testimony of a Forest Service

25   employee, Defendant Jones—who is not an owl biologist. Resp. at 18 (citing generally ECF 18-

26   1); *contra* ECF No. 9-7. This Court owes no deference to declarations of agency officials in the

27

28        [6] Defendants' citation to a case involving a procedural injury "standing alone" is inapplicable. *Nevada v.*
     *United States*, 364 F. Supp. 3d 1146, 1154 (D. Nev. 2019).

PLS.' REPLY ISO TRO/PI - 11

injunction context. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011).

Finally, Defendants' claims about working with the Service must be taken with a grain of salt because no ESA Section 7 consultation has been completed. *See* Section I.E, *supra*. While Defendants claim to have worked with the Service to avoid impacts to the owl, the Forest Service—glaringly—did not adopt the Service's key recommendations.[7] For example, while the Service recommended the retention of trees >26" within NRF habitat, ECF 18-11 at 2, the contracts only protect trees >30". ECF No. 9-18 at 5, ECF No. 9-22 at 4; *see also* ECF No. 6-7 ¶ 15 (explaining that the areas contain very few trees over 30", underscoring the importance of retaining smaller trees). And the Service further recommended retaining trees >10" not just in occupied core areas, but also in home ranges, which are much bigger in size. Upon information and belief, the majority of the PFERP area is within owl home ranges, which are over twice the size of core areas. *See* ECF 9-1 at 45 (home ranges consist of a 1.3-mile circle around an activity center). Defendants' focus on core areas only tells part of the story. *Cf.* ECF 9-1 at 53–54 (explaining that the Service's basis for estimating effects from habitat modification includes effects to both core areas and home ranges); *compare* ECF No. 9-1 at 7-5 (overlaying treatments on NSO home ranges) *with* ECF No. 9-14 (overlaying treatments only on NSO core areas).

## IV.    The Balance of Hardships and Public Interest Favor an Injunction.

Under Defendants theory, even if Plaintiffs prove a likelihood of success on the merits and irreparable harm, Defendants should still be allowed to proceed with unlawful logging operations because their characterizations of fuel reduction activities trump all else. But such characterizations have not been vetted in accordance with a full and fair NEPA process, nor have they been subject to ESA Section 7 Consultation. *Compare, e.g.*, ECF No. 18-11 ¶ 9 (touting benefits of logging within owl habitat) *with* ECF No. 9-1 at 179 (underscoring that the effects of projects designed to influence fire severity are "uncertain and highly debated in the literature"). Sanctioning this proposition would set a dangerous precedent, incentivizing flagrant violations of the law because the government could carry out its activities in any event. Defendants completely

---

[7] Defendants' argument also ignores the fact that the agency auctioned and awarded the contracts **before** engaging with the Service. *See, e.g.*, ECF No. 18-11 (Service's recommendations provided on November 21, 2025).

PLS.' REPLY ISO TRO/PI - 12

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

ignore the paramount public interest of having the government comply with the law. *See Env't. Prot. Info. Ctr*, 968 F.3d at 992 (9th Cir. 2020) ("The public interest is served by requiring the Forest Service to comply with the law.").

Defendants focus on monetary losses to the Forest Service under the public interest factor, but under this factor, a court "primarily addresses impact on non-parties rather than parties." *LOWD*, 752 F.3d at 766. Even if these losses are considered, however, while the agency and its contractors may stand to lose money if Plaintiffs' request is granted, the "loss of anticipated revenues . . . does not outweigh the potential irreparable damage to the environment. *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2003). Importantly, the "Government's economic loss cannot be considered compelling if it is to be gained in contravention of federal law." *Wilderness Soc'y v. Tyrrel*, 701 F. Supp. 1473, 1491 (E.D. Cal. 1988).

Finally, the equities must be weighed in the context of the narrow scope of the injunction, where PFERP activities on over 770 acres could move forward. Defendants fail to demonstrate that the balance of activities—commercial logging operations—are so essential as to outweigh any other interests. *See LOWD*, 752 F.3d at 765–66 (explaining that courts are to "consider only the portion of the harm that would occur while the preliminary injunction is in place").

## V.    Scope of Injunction

In passing, Defendants suggest that the requested relief is overbroad. Resp. at 20.[8] Their

---

[8] Defendants have also alleged that Plaintiffs "moved the goalposts during conferral. ECF No. 7 at 1. But Plaintiffs' entire conferral process surrounding their request for emergency relief has been in good faith, despite Defendants' attempt to frame it otherwise. Plaintiffs were working under a considerable disadvantage regarding the lack of information. Indeed, Despite the fact that it was signed on October 15, and Plaintiffs' members had repeatedly asked for it from agency staff, it was not until November 25, 2025 that the Forest Service through its counsel finally provided the PFERP authorization to Plaintiffs. *See* Darzen 2d Decl., Exhibit 1. Plaintiffs thereafter opted to engage in a robust conferral, generously providing a 5–6-day window on account of the Thanksgiving holiday. ECF No. 7-1. Given this timeframe, during which they conceded nearly a week of logging operations, Plaintiffs' objective clearly was to get an agreement.

Moreover, while counsel explained Plaintiffs' principal concerns about logging operations within NSO NRF habitat, "**including** those areas demarcated as such on the Rainier and Long Canyon timber sale maps," *Id.* (emphasis added), there was no representation that Plaintiffs were concerned **only** about those areas demarcated as NRF habitat on the maps. As discussed herein, Plaintiffs have been and remain concerned that the maps do not accurately depict all of the NRF habitat within the timber sale units.

Ultimately, the Parties were not able to reach an agreement, particularly because Defendants would not agree to suspend logging operations beyond December 12, 2025—even if a decision on a preliminary injunction remained pending—nor would they agree to stay out of NRF. *See* 2d Darzen Decl. Ex. 2.

PLS.' REPLY ISO TRO/PI - 13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1  argument is based on the premise that some of the timber sale units target non-habitat. But as

2  discussed above, *see* Section I.E *supra*, there is a significant concern here that the Forest Service

3  has mistyped habitat. *See also* ECF No. 6-7 at ¶¶ 15–16 & Photos 1–2. Plaintiffs' requested relief

4  is appropriately narrow because it would allow the Forest Service to move forward with nearly

5  65% of the PFERP activities.

6  ## VI.  No Bond Should Be Required

7  Defendants request a $5,000 bond for a TRO and a $50,000 for a PI, but as courts have long held,

8  bonds should not be required if the effect would be to discourage public interest environmental

9  litigation. Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency, 766 F.2d 1319, 1325 (9th

10 Cir. 1985); Klamath Forest All. v. U.S. Fish & Wildlife Serv., No. 2:24-cv-02347-DC-CSK, 2025

11 U.S. Dist. LEXIS 190582, at *48 (E.D. Cal. Sept. 26, 2025) ($100 nominal bond); Wildlands v.

12 Warnack, 570 F. Supp. 3d 983, 993 (D. Or. 2021) (declining to impose even a nominal bond). In

13 such cases, the focus is on Plaintiffs' ability to pay and the chilling effect on public interest

14 litigation, and Plaintiffs here have filed declarations attesting to their non-profit statuses, limited

15 resources, and inability to post a bond. ECF Nos. 6-4, -5, -7.

16 In Klamath Forest Alliance, this Court "decline[d] to require Plaintiffs to post Defendants'

17 requested bond amount given Plaintiffs' demonstrated inability to pay" for three of the four

18 organizations involved in the instant lawsuit. 2025 U.S. Dist. LEXIS 190582, at *47 ("The

19 court."); accord EPIC, 968 F.3d 985 (no bond required for plaintiff EPIC). The remaining

20 Plaintiff here, Safe Alternatives for our Forest Environment, is an all-volunteer organization that

21 "does not have any funds available to post a bond." ECF No. 6-5 ¶ 16. In contrast, the plaintiffs in

22 a case cited by Defendants, did not "address[] the issue of the posting of a bond," and one of the

23 plaintiffs was the "independent sovereign State of California." Cal. Nat. Res. Agency v. Ross

24 ("CNRA"), No. 1:20-cv-00426-DAD-EPG, 2020 U.S. Dist. LEXIS 83612, at *61–*63 (E.D. Cal.

25 May 11, 2020). Even on those facts, the court imposed only a $1,000 bond.[9]

26

27  [9] It is unclear how IRS records showing the organizations' net assets change the calculus. For Plaintiffs
EPIC and KFA, for example, a "vast majority of funds are contractually allocated to go towards programs and
expenses outside of legal expenses," ECF No. 6-7 ¶ 25, meaning that funds cannot just be shifted around to pay for a

28 bond. Imposition of a bond would present a "significant and insurmountable hurdle," "effectively stop[ing] [the]

PLS.' REPLY ISO TRO/PI - 14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant their Motion for Temporary Restraining Order and Preliminary Injunction.

---

ability to participate in the case." ECF No. 6-4 ¶ 18. No further showing is required.

PLS.' REPLY ISO TRO/PI - 15

1    DATED this 5th day of December, 2025.

2        Respectfully submitted,

3            /s/ Meriel L. Darzen
            Meriel L. Darzen (OR Bar # 113645)
4            (503) 525-2725 | meriel@crag.org
            Oliver J. H. Stiefel (OR Bar # 135436)
5            (503) 227-2212 | oliver@crag.org
            Kelsey Y. Dunn (OR Bar No. 244709)
6            (503) 234-0788 | kelsey@crag.org
            CRAG LAW CENTER
7            3141 E. Burnside St.
            Portland, Oregon 97214
8            Fax: (503) 296-5454
            *Pro Hac Vice*
9
            /s/ Thomas E. Wheeler
10           Thomas E. Wheeler (CA Bar No. 304191)
            (707) 446-9027 | tom@wildcalifornia.org
11           ENVIRONMENTAL PROTECTION INFORMATION CENTER
            145 G. Street, Suite A
12           Arcata, CA 95521

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' MEMO ISO TRO/PI -

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on December 5, 2025, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system, which will send electronic notification of such

4

filing to all counsel of record.

5

/s/ Thomas E. Wheeler
Thomas E. Wheeler (CA Bar No. 304191)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' REPLY ISO TRO/PI - II