1
2
3
4
5
6
7
8              **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    KLAMATH FOREST ALLIANCE, et al.,          No.  2:25-CV-3424-DMC

12              Plaintiffs,

13        v.                                     MEMORANDUM OPINION AND ORDER

14    TARA JONES, et al.,

15              Defendants.

16

17              Plaintiffs, which are proceeding with retained counsel, bring this civil action for

18    judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 706.  Plaintiffs seek

19    declaratory relief and an injunction prohibiting the United States Forest Service from

20    implementing specific provisions of the North Trinity County Community Risk Reduction

21    Project (hereafter "North Trinity Project") pending compliance with the National Environmental

22    Policy Act and the National Forest Management Act.  See generally ECF No. 1 (Plaintiffs'

23    complaint).  Pursuant to the written consent of all parties, this case is before the undersigned as

24    the presiding judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c);

25    see also ECF No. 17 (minute order reassigning action to Magistrate Judge).

26    / / /

27    / / /

28    / / /

Pending before the Court is Plaintiffs' combined motion for a temporary restraining order and preliminary injunction.  See ECF Nos. 6, 8, and 9.  Plaintiffs seek to enjoin two pending commercial logging operations undertaken in conjunction with the North Trinity Project, which operations Plaintiffs contend will cause irreparable harm to the essential habitat of the Northern Spotted Owl, a species listed as threatened under the Endangered Species Act.  See generally ECF No. 6-1 (Plaintiffs' memorandum).  Defendants have filed an opposition.  See ECF No. 18.  Plaintiffs have filed a reply.  See ECF No. 19.  The parties appeared before the undersigned via Zoom for a hearing on December 10, 2025, at 2:00 p.m.  Meriel Darzen, Esq., argued on behalf of Plaintiffs.  Erika Norman, Esq., argued on behalf of Defendants.  After considering the parties' arguments, the Court directed the parties to each file a supplemental brief on or before 12:00 p.m. Pacific Standard Time on December 12, 2025.  The parties have timely submitted their supplemental briefs.  See ECF Nos. 25 and 26.

## I. BACKGROUND

### A.    Chronology

In 1990, the United States Fish and Wildlife Service listed the Northern Spotted Owl (NSO) as a threatened species under the Endangered Species Act due to habitat loss and modification, as well as lack of protective regulatory mechanisms.  See Klamath Forest Alliance v. U.S. Fish and Wildlife Service, 2:24-cv-2347-DC-CSK (ECF No. 47, pg. 6, Order Granting Preliminary Injunction, citing agency record).[1]  The court in Klamath Forest Alliance v. U.S. Fish and Wildlife Service noted that, in addition to habitat loss, "[t]he barred owl's movement into NSO territory may be the most significant contributor to the NSO's decline."  Id.  The court also noted that the United States Fish and Wildlife Service considered "uplisting" the NSO to endangered in 2020, but did not do so due to higher priority listing decisions.  See id.

---

[1]    **Error! Main Document Only.**The Court may take judicial notice pursuant to Federal Rule of Evidence 201 of matters of public record.  See U.S. v. 14.02 Acres of Land, 530 F.3d 883, 894 (9th Cir. 2008).  Thus, this Court may take judicial notice of state court records, see Kasey v. Molybdenum Corp. of America, 336 F.2d 560, 563 (9th Cir. 1964), as well as its own records, see Chandler v. U.S., 378 F.2d 906, 909 (9th Cir. 1967).

In 1995, the Shasta-Trinity National Forest Land and Resource Management Plan (1995 Forest Plan) was promulgated calling for the United States Forest Service (USFS) to "[m]aintain and/or enhance habitat for [threatened and endangered] species with individual species recovery plans. . . ," among other actions.  See ECF No. 18-1, ¶ 42 (Declaration of Tara Jones).

In November 2024, the USFS issued a scoping notice for the North Trinity County Community Risk Reduction Project (North Trinity Project).  See id. at ¶ 28.  The North Trinity Project covers an area of approximately 12,800 acres in the Shasta-Trinity National Forest.  See id. at ¶ 27.  Analysis for the North Trinity Project is underway, and Defendants anticipate completion of an environmental assessment in late 2026.  See id.

On March 1, 2025, President Trump issued Executive Order 14255, entitled "Immediate Expansion of American Timber Production."  ECF No. 9, ¶ 11 (Declaration of Kelsey Dunn).  On April 3, 2025, the Secretary of Agriculture issued Secretary's Memorandum 1078-006, entitled "Increasing Timber Production and Designating an Emergency Situation on National Forest System Lands."  Id. at ¶ 12.

In July 2025, revised regulations were promulgated, including 7 C.F.R § 1b.9(w) authorizing certain emergency actions by United States Department of Agriculture subcomponents, as well as 7 C.F.R. § 1b.11(a)(13) defining "emergency."

On October 7, 2025, the Acting Regional Forester sought approval from the Chief of the USFS for the Peak Fire Emergency Response Project (PFERP) pursuant to 7 C.F.R. § 1b.9(w).  See ECF No. 18-1, ¶ 7. The request was granted on October 15, 2025.  See id.  The PFERP calls for fuels reduction treatments on approximately 1,200 acres along strategic locations within the larger 12,800-acre North Trinity Project area.  See id. at ¶ 8.  The PFERP includes commercial timber sales and non-commercial treatments.  See id.

Implementation of the PFERP began on November 19, 2025, and is ongoing.  See id. at ¶ 47.  Defendants anticipate completion of the PFERP within 12 months.  See id.  During this 12-month period, certain periods of time are designated as limited operating periods (LOPs) from February 1 through September 15.  See id. at ¶ 48.  This LOP restricts operations in suitable

1    NSO habitat.  See id.  The purpose of the restriction is to protect nesting owls and their offspring

2    from disturbance during the NSO breeding season.  See id.

3              Consistent with the PFERP, the USFS has awarded two commercial timber sale

4    contracts.  See id. at ¶ 50.  The Ranier timber sale contract (Ranier Contract) was awarded to

5    Sierra Pacific Industries on November 3, 2025.  See id. at ¶ 54.  The Rainer Contract

6    encompasses 225 acres of "mandatory harvest units."  Id. at ¶ 55.  Work on the Ranier Contract

7    began on November 19, 2025.  See id. at ¶ 56.  The Rainier Contract has a termination date of

8    February 1, 2026, consistent with the LOP.  See id. at 54.  The Long Canyon timber sale contract

9    (Long Canyon Contract) was awarded to Trinity River Lumber on November 7, 2025.  See id. at

10   ¶ 51.  The Long Canyon Contract encompasses 206 acres of thinning in "Fuel Management

11   Zones."  Id. at ¶ 52.  Work under the Long Canyon Contract began on November 25, 2025.  See

12   id. at ¶ 53.  The Long Canyon Contract has a termination date of January 31, 2026, consistent

13   with the LOP.  See id. at 51.

14             Though no party has provided the Court with complete copies of either the

15   Rainier Contract or the Long Canyon Contract, Plaintiffs have provided portions of those

16   agreements.  See ECF Nos. 9-17 (Exhibit 17 to the Declaration of Kelsey Dunn consisting of

17   pages 142-180 of the Rainier Contract) and 9-21 (Exhibit 21 to the Declaration of Kelsey Dunn

18   consisting of pages 142-180 of the Long Canyon Contract).  These exhibits reflect that both

19   agreements contain significant limitations as to the trees permitted to be cut, including limitations

20   associated with tree size, species, location, and proximity to other trees.[2]  See id.

21

22   **B.    Plaintiffs' Complaint**

23             Plaintiffs claim that implementation of the PFERP under 7 C.F.R. § 1b.9(w),

24   specifically awarding the Rainier Contract and the Long Canyon Contract, violates both the

---

25       [2]    In Plaintiffs' brief, Ms. Dunn states that both contracts permit the cutting of trees
26   up to 30 inches in diameter at breast height.  See ECF No. 6-1, pg. 17.  In support of this
     statement, counsel cites to page six of Exhibit 12 of her declaration.  See id.  Exhibit 12, however,
27   is a three-page document appearing to be a USFS web page update on the Swift Complex and
     Cedar Fire wildfires dated September 10, 2025.  See ECF No. 9-12.  Exhibit 12 makes no
28   reference to either the Rainier Contract or the Long Canyon Contract, both of which were entered
     into in November 2025.

National Environmental Policy Act (NEPA) and the National Forest Management Act (NFMA). See generally ECF No. 1 (Plaintiffs' complaint).

As to NEPA, Plaintiffs allege that the USFS's application of 7 C.F.R. § 1b.9(w) was "arbitrary, capricious, not in accordance with, and without observance of procedure required by law." Id. at 21. Plaintiffs further allege that, by implementing the PFERP under emergency authority, the USFS is "unlawfully evading its duties under NEPA." Id. at 22.

As to NFMA, Plaintiffs allege: "The Forest Service has failed to establish that the North Trinity Project and its implementing activities, including those taken pursuant to the emergency response, are consistent with the provisions of the Forest Plan." Id. at 22. As such, Plaintiffs conclude, USFS's "failure to demonstrate consistency . . . is arbitrary, capricious, not in accordance with, and without observance of procedure required by law." Id. at 23.

Accordingly, Plaintiffs seek declaratory and injunctive relief "[p]rohibiting the Forest Service from implementing the North Trinity Project, unless and until the agency has completed lawful NEPA analysis and demonstrated consistency with the [1995] Forest Plan." Id.

## II. DISCUSSION

In the pending combined motion for a temporary restraining order and preliminary injunction, Plaintiffs "seek to enjoin the approximately 430 acres of non-plantation commercial logging operations authorized by the PFERP under the Rainier and Long Canyon timber sales (Rainier: 225 acres; Long Canyon: 205 acres)."[3] ECF No. 6-1, pg. 32. Plaintiffs' motion asks the Court to enjoin ongoing logging activity on a specific portion of the 1,200-acre area covered by the PFERP and seeks no immediate relief with respect to any other area covered by the PFERP or the larger 12,800-acre area covered by the North Trinity Project.

The legal principles applicable to requests for injunctive relief, such as a temporary restraining order or preliminary injunction, are well established. To obtain injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of

---

[3]    Defendants' evidence indicates the Long Canyon Contract encompasses 206 acres, not 205 acres. See ECF No. 18-1, ¶ 52 (Declaration of Tara Jones). The total area encompassed by both the Rainier Contract and the Long Canyon Contract is, according to Ms. Jones' declaration, 431 acres. See id. at ¶¶ 52 (describing the Long Canyon contract) and 55 (describing the Rainier Contract).

irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  See Starbucks Corp. v. McKinney, 602 U.S. 339, 345-46 (2024) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). The party seeking injunctive relief bears the burden of establishing each of these elements.  See Klein v. City of San Clemente, 584 F.3d 1196, 1201 (9th Cir. 2009).

The Ninth Circuit has adopted a "'sliding scale test,' which allows a strong showing on the balance of hardships to compensate for a lesser showing of likelihood of success." Where Do We Go Berkeley v. Cal. Dep't of Transp., 32 F.4th 852, 859 (9th Cir. 2022) (citing All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011)).  "[W]hen plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the merits." Id. (citing Cottrell, 632 F.3d at 1135). "[T]he serious questions standard is 'a lesser showing than likelihood of success on the merits.'" Flathead-Lolo-Bitterroot Citizen Task Force v. Montana, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting All. for the Wild Rockies v. Pena, 865 F.3d 1211, 1217 (9th Cir. 2017)). "Serious questions are so 'substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation omitted).  Although "[s]erious questions need not promise a certainty of success, nor even present a probability of success, [they] must involve a 'fair chance of success on the merits.'" Id. (quoting National Wildlife Fed'n v. Coston, 773 F.2d 1513, 1517 (9th Cir. 1985)).

**A.    Likelihood of Irreparable Harm**

To satisfy the irreparable harm element, the moving party must show that "irreparable harm is likely, not just possible." Cottrell, 632 F.3d at 1131 (citing Winter, 555 U.S. at 22).  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Vill. Of Gambell, 480 U.S. 531, 545 (1987); see also Cottrell, 632 F.3d at 1135. "The Supreme Court has not established that, as a rule, any potential environmental injury merits an injunction."  Lands Council v. McNair, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc).

In the pending motion for emergency injunctive relief as to commercial logging operations on approximately 430 acres covered by the Rainier Contract and the Long Canyon Contract, Plaintiffs identify two harms. First Plaintiffs identify harm to the environment and "Plaintiffs' interests." ECF No. 6-1, pgs. 27-29. Second, Plaintiffs identify "procedural harm." Id. at 29-30.

        1.   Harm to the Environment and Plaintiffs' Interests

As to the first harm they identify, Plaintiffs contend:

> The Rainier and Long Canyon Timber Sales, as authorized by the PFERP, involve extensive commercial logging (Forest Resilience and FMZ treatments) on over 400 acres of the North Trinity Project area. *See* Decl. Dunn, Ex. 16, 20 (Sale Documents). Both contracts allow for cutting of trees up to 30 inches in diameter at breast height ("dbh"). *See Id.*, Ex. 17 at 6, Ex. 21 at 6 (Sale Contract Provisions).
>
> The Timber Sales primarily treat forest units that are designated as Late Successional Reserve ("LSR") and comprise NSO nesting, roosting, and foraging habitat, in addition to NSO dispersal habitat. Decl. Baker ¶ ; Decl. Boggs ¶ 7. The Long Canyon and Rainier Sale units are situated within a "checkerboard" landscape of NFS land interspersed with private lands, which have been so heavily logged they can no longer support owl habitat, rendering the remaining mature stands located in the National Forest even more important for owls. *See* Decl. Dunn, Ex. 4 at 3; Ex. 6 at 3; Ex. 7 at 1, 4; Ex. 8 at 9; Boggs Decl. ¶¶ 9–12, 14. Three occupied owl nest cores and surrounding habitat are overlapped by the Timber Sales. *See* Ex. 14. These sales target habitat that these NSO pairs rely on for critical life functions. *See Id.*; Ex. 7 at 5–6; Baker Decl. ¶¶ 14-17; Boggs Decl. ¶¶ 9, 11.
>
> Plaintiffs have visited or live nearby the PFERP area and the Long Canyon and Rainier units. Belter Decl. ¶ 2 ("I . . . live just down the road from the Long Canyon timber sale."); Oddo Decl. ¶ 2 ("I have lived [at the top of Long Canyon Road] for 25 years . . ."); Baker Decl. ¶¶ 6, 14, 15; Glass Decl. ¶¶ 2, 8, 12; Boggs Decl. ¶¶ 5, 7. Plaintiffs and their members frequently use and enjoy the forest for recreation, birdwatching, and engaging in advocacy. *See e.g., id.* Plaintiffs and their members have deep connections to the forest and the trees, including for spiritual fulfillment. *See e.g.,* Baker Decl. ¶¶ 7, 8; Belter Decl. ¶¶ 4–5, 14; Oddo Decl. ¶¶ 6, 8, 14 ("[M]y greatest joy is walking the forest and feeling the exhilaration of its beauty and solitude"). Had the agency engaged in the NEPA process before beginning logging, Plaintiffs would have engaged in good faith to try to avoid these harms by advocating for changes to the project. Decl. Glass ¶ 7. They have now been cut out of the process and the forests are being cut.
>
> Once the mature forests are logged, the harm is long-lasting if not permanent. *LOWD*, 752 F.3d at 764–65 ("The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage."). Absent preliminary relief from this court, Plaintiffs and their members will suffer irreparable harm from the loss of

1

2

3

these trees and harm to the wildlife that utilize them. *See, e.g.*, Oddo Decl.
¶ 14; Belter Decl. ¶ 14; Boggs Decl. ¶¶ 16; Glass Decl. ¶ 13.

ECF No. 6-1, pgs. 27-29.

4

5

6

7

8

Plaintiffs' argument encompasses alleged harm Plaintiffs' members would suffer by way of loss of trees under the Rainier Contract and Long Canyon Contract, as well as harm to the NSO due to logging under these contracts.[4]  Each is discussed below, beginning with a discussion of the potential for irreparable harm posed to the NSO as a result of the two logging contracts at issue here.

9

i.      Harm to the NSO

10

11

12

13

14

15

16

17

18

19

Recognizing the status of the NSO, the Court is particularly concerned with Ms. Dunn's statement in support of Plaintiffs' brief that "[t]hree occupied owl nest cores and surrounding habitat are overlapped by the Timber Sales."  ECF No. 6-1, pg. 28.  Ms. Dunn cites Exhibit 14 of her declaration in support of this contention.  Exhibit 14 is a map depicting the entire PFERP area, not just the acreage associated with the Timber Sales at issue in this motion for injunctive relief. The map in Exhibit 14 is overlaid with circles depicting occupied NSO cores (in red) and unoccupied NSO cores (in black).  See ECF No. 9-14.  Exhibit 14 reflects that a total of six NSO cores are within the 1,200-acre PFERP area.  See id.  Of these, the map indicates that four are occupied and two are unoccupied.  See id.  Exhibit 14 does not designate the timber sales acreage.

20

21

22

23

24

25

In order to evaluate Ms. Dunn's assertion that the areas encompassed by the two timber sales contracts at issue overlap occupied NSO cores, the Court has compared maps of the timber sales areas with the map provided by Ms. Dunn at Exhibit 14.  Tara Jones, the District Ranger on the Shasta-Trinity National Forest in the Pacific Southwest Region (Region 5), has submitted in support of her declaration (See ECF Nos. 18-1 through 18-14) a map showing the 206-acre Long Canyon Contract site within the larger PFERP site.  See Exhibit 12, ECF No. 18-

26

27

28

---

[4]      The Court observes that, despite extensive briefing regarding the NSO and NSO habitat, the majority of Plaintiffs' argument, both in their initial brief and supplemental brief, focuses mostly on irreparable injuries <u>other</u> than those to the NSO (i.e., Plaintiffs' members' harms resulting from loss of trees).

1    13. Also offered in support of the Jones declaration is Exhibit 13, a map showing the 225-acre

2    Rainier Contract site within the larger PFERP site.  <u>See</u> ECF No. 18-14.

3             A study of these maps alongside Ms. Dunn's Exhibit 14 is illuminating.

4    Specifically, contrary to Ms. Dunn's suggestion, neither the Rainier Contract area nor the Long

5    Canyon Contract area overlap occupied NSO cores.  <u>Compare</u> ECF Nos. 9-14, 18-13, and 18-14.

6    While the maps show that the Rainier Contract area overlaps an NSO core, Ms. Dunn's map at

7    Exhibit 14 shows that this particular NSO core is unoccupied.  <u>Compare</u> ECF Nos. 9-14 and 8-14.

8    Similarly, the maps show that the Long Canyon Contract project area runs adjacent to an

9    occupied NSO core on the northeastern edge of that core but does not overlap the occupied NSO

10    core.  <u>Compare</u> ECF Nos. 9-14 and 8-12.

11             These three maps (the PFERP area, the Rainier Contract area, the Long Canyon

12    Contract area) reveal an additional detail of relevance here.  Specifically, the Court observes that

13    the areas encompassed by the two logging contracts appear to be specifically tailored to <u>avoid</u>

14    activity in occupied NSO cores.  As indicated above, the Long Canyon Contract area is adjacent

15    to, but not overlapping, an occupied NSO core on the northeastern edge of that core.  <u>Compare</u>

16    ECF Nos. 9-14 and 18-13.  Likewise, the Rainier Contract area is adjacent to, but not

17    overlapping, the same occupied NSO core on the southern edge of that core.  <u>Compare</u> ECF Nos.

18    9-14 and 18-14.  Finally, though the Rainier Contract area overlaps a portion of one unoccupied

19    NSO core, that core has not been unoccupied since 2021.  <u>See</u> ECF No. 18-1, ¶ 46.  On the

20    evidence currently before the Court, Ms. Jones' declaration is persuasive when she states

21    ". . .there are no timber sale units located within any occupied or active NSO cores as part of the

22    emergency response."  <u>Id.</u>

23             Contrary to Ms. Dunn's assertion, the evidence shows that the logging contracts at

24    issue have been tailored in such a way to prevent harm to the NSO, particularly occupied cores.

25    The Court finds that Plaintiffs have failed to meet their burden on a motion for emergency

26    injunctive relief that there is a likelihood, as opposed to the possibility, of irreparable injury to the

27    NSO as a result of the limited commercial logging operations Plaintiffs seek to enjoin.

28    / / /

1              ii.      Harm to Plaintiffs' Members Interests

2              Here, the Court finds that Plaintiffs have a stronger position, supported by caselaw

3      instructing that environmental injury, such as the logging of trees, is often irreparable per se.  See

4      Amoco Prod. Co., 480 U.S. at 545; Cottrell, 632 F.3d at 1135; see also All. For the Wild Rockies

5      v. Pena, 865 F.3d 1211, 1131 (9th Cir. 2017); Env't Democracy Project v. Green Sage Mgmt.,

6      LLC, 2022 WL 4596616, at *3 (N.D. Cal. Aug. 23, 2022) (quoting Sierra Club v. U.S. Forest

7      Serv., 843 F.2d 1190, 1195 (9th Cir. 1988) (citations omitted)).  Additionally, as required by the

8      applicable caselaw, Plaintiffs' members have, by way of their various declarations submitted with

9      both Plaintiffs' opening and supplemental briefs, "show[n] that they themselves are likely to

10     suffer irreparable harm. . . ."  Nat'l Wildlife Fed'n v. Nat'l Marine, 886 F.3d 803, 822 (9th Cir.

11     2018).  In this regard, the Court accepts the following summary of Plaintiffs' members'

12     declarations as contained in Plaintiffs' supplemental brief:

13                     . . . The Rainier and Long Canyon timber sales will cut thousands
               of mature trees, which will permanently harm Plaintiffs' ability to view,
14             experience, and utilize these areas of forest. Plaintiffs' members use the
               PFERP area for work and recreational purposes, including recreation,
15             birdwatching, botany, and advocacy. Nicole Belter moved "just down the
               road from the Long Canyon timber sale" 1.5 years ago "to be closer to
16             nature and observe wildlife." Belter Decl. ¶ 2. "Seeing the wildlife and
               hearing so many bird species" brings her "great joy and a deep sense of
17             peace." Id. She worries that forest canopy reductions, temporary roads,
               and landings "will impact the places where [she enjoys] recreating"
18             because the "biodiversity lost will be irreparable." Id. at ¶12. Ms. Belter
               has observed the areas currently being logged under the Long Canyon sale
19             in Unit 1. Belter Decl. ¶ 4, Photos 4-7. Operations are "devastating" the
               forest, irreversibly harming her experience and use of the project Area. Id.
20             ¶ 4, Photo 3 ("I have seen hundreds of calypso orchids bloom in an area
               that now is destroyed . . .The orchids will never bloom again."). Ms.
21             Belter describes how logging of "big, healthy trees" in the area will cause
               lasting harm, and that the area "has already been changed drastically by
22             the past few weeks of logging." First Belter Decl. ¶¶ 7–9.
                       Richard Oddo is also a resident who moved to the area over 25
23             years ago "because of the remoteness and to enjoy nature." Oddo Decl. ¶
               6. Oddo walks his property and into the National Forest every day to view
24             wildlife and rare vegetation, and "walk alone in the beautiful forest." Id. ¶
               8. Severe logging under the sales "will remove a large proportion of our
25             healthiest trees"; "money does not replace a forest once it is cut down and
               decimated by logging." Id. ¶ 14. . . .
26
               ECF No. 26, pgs. 14-15.
27
28             The Court is unimpressed by defense counsel's suggestion at the December 10,

                                             10

1    2025, hearing that Plaintiffs' harm is minimized because there are over 1.2 million acres of

2    National Forest lands Plaintiffs' members can enjoy.  In this Court's view, the existence of other

3    trees does not minimize the harm resulting from loss of the particular trees at issue in this case

4    which lie within areas encompassed by the Rainier Contract or the Long Canyon Contract and

5    where some of Plaintiffs' members reside.  See All. for the Wild Rockies, 865 F.3d at 1127

6    (noting that the "logical extension" of defendant's argument that plaintiff can "view, experience,

7    and utilize" other areas of the forest "is that a plaintiff can never suffer irreparable injury resulting

8    from environmental harm in a forest area as long as there are other areas of the forest that are not

9    harmed"); see also Am. River Trees v. Cent. Valley Prot. Bd., 2025 Lexis 520437, at *29-33

10   (E.D. Cal. Nov. 20, 2025).

11           Based on the foregoing, the Court concludes that Plaintiffs have met their burden

12   of establishing the likelihood of irreparable injury to their members' interests resulting from

13   commercial logging under the Rainier Contract and Long Canyon Contract.

14           2.      Procedural Harm

15   Plaintiffs argue:

16           Defendants have unlawfully failed to fulfill their procedural
             obligations under NEPA by implementing the PFERP, including through
17           the Long Canyon and Rainier Sales, prior to completing environmental
             review. See Section II.A, supra. Tree cutting and removal has already
18           begun on at least one unit in each of the sales, without compliance with
             NEPA's public process requirements. Baker Decl. ¶¶ 16. For purposes of
19           preliminary relief, "[t]he NEPA duty is more than a technicality; it is an
             extremely important statutory requirement to serve the public and the
20           agency before major federal Actions occur. If plaintiffs succeed on the
             merits, then the lack of an adequate environmental consideration looms as
21           a serious, immediate, and irreparable injury." Bernhardt, 391 F. Supp. 3d
             at 1022 (citations and internal marks omitted). Procedural harms, when
22           paired with irreparable environmental harms, result in irreparable
             procedural injury. Cf. Save Strawberry Canyon v. Dep't of Energy, 613 F.
23           Supp. 2d 1177, 1187 (N.D. Cal. 2019) ("The procedural injury is also
             irreparable" and "imminent" given "the project will soon break ground,
24           including clearing out acres of trees. . .").
             Plaintiffs have articulated procedural harms resulting from
25           Defendants' implementation of the North Trinity project without
             following required procedures or appropriate alignment with the public
26           participation aim of NEPA. See Glass Decl. ¶¶ 14–15; Boggs Decl. ¶¶ 15–
             17. At the scoping stage, Plaintiffs submitted comments raising alarm
27           about impacts to old growth and species that rely on mature forests such as
             NSO. Baker Decl. ¶ 11; Glass Decl. ¶¶ 8–10; Boggs Decl. ¶ 8. Defendants
28           failed to release draft or final NEPA documents prior to authorization of

                                            11

the non-emergent timber sales, and Plaintiffs are harmed by the lack of public engagement and notice, which is required by NEPA and its implementing regulations. *See* Section II.A, *supra*; Glass Decl. ¶¶ 11–14 (frequent requests for information were unanswered); Stiefel Decl., ¶¶ 6-7. The absence of proper process, paired with the permanent environmental harm of logging that will result from the illegally authorized Timber Sales, will result in irreversible procedural harms to Plaintiffs and their members if the Sales are not enjoined. *W. Watersheds Proj. v. Zinke*, 336 F. Supp. 3d 1204, 1241 (D. Idaho 2018) ("an incomplete observance of environmental laws and procedure (through abbreviated NEPA reviews and less complete public comments or none at all), aided by agency inertia, combine to create irreparable harm."). . . .

ECF No. 6-1, pgs. 29-30.

Plaintiffs assert procedural harm absent an injunction in that the logging operations would be allowed to continue absent procedural safeguards required under NEPA. See ECF No. 6-1, pg. 29.  Defendants contend that procedural harms cannot support a finding of irreparable injury.  See ECF No. 18, pg. 25 (citing Nevada v. United States, 364 F. Supp. 3d 1146, 1152-53 (D. Nev. 2019.  Defendants also contend that the procedural safeguards Plaintiffs say will be denied to them are unavailable for an emergency action under 7 C.F.R. 1b.9(w).  See id.

Defendants' position is unpersuasive.  While procedural harm alone cannot support a finding of irreparable injury, procedural harm can rise to such a level when, as here, they are coupled with irreparable environmental harm.  See Save Strawberry Canyon v. Dep't of Energy, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2019).

**B.    Likelihood of Success on the Merits**

Judicial review of the merits of Plaintiffs' NEPA and NFMA claims is governed by the Administrative Procedures Act ("APA")  See 5 U.S.C. § 706(2)(A); see also N. Alaska Env't Ctr. V. U.S. Dep't of the Interior, 983 F.3d 1077, 1084 (9th Cir. 2020) (reviewing a NEPA claim under the APA); Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005 (reviewing NFMA claim under the APA).  Pursuant to the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

1    706(2)(A).  An agency action is arbitrary and capricious if the agency has:

2
3           . . .relied on factors which Congress has not intended it to consider,
            entirely failed to consider an important aspect of the problem, offered an
            explanation for its decision that runs counter to the evidence before the
4           agency, or is to implausible that it could not be ascribed to a difference in
            view or the product of agency expertise.

5           Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries
6           Serv., 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting Motor Vehicle Mfrs.
            Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43
7           (1983)).

8
9           "Under the arbitrary and capricious standard, the scope of review is deferential and

10   narrow, and the court is not to substitute its judgment for the agency's judgment." Friends of

11   Animals v. Haaland, 997 F.3d 1010, 1015 (9th Cir. 2021) (citation omitted). "Nevertheless, the

12   agency must examine the relevant data and articulate a satisfactory explanation for its action

13   including a rational connection between the facts found and the choice made." State Farm, 463

14   U.S. at 43 (internal quotation marks and citation omitted). A court may not accept an agency's

15   post hoc rationalizations for its action. Id. at 50. "It is well-established that an agency's action

16   must be upheld, if at all, on the basis articulated by the agency itself." Id. (citation omitted).

17           Consistent with the foregoing standard of review, the Court will consider below

18   whether Plaintiffs have established either a likelihood of success or serious questions on the

19   merits of their claims under NEPA and NFMA.

20           1.    NFMA

21           NFMA establishes a two-step process for managing National Forest System lands.

22   See 16 U.S.C. § 1604(a), (i); see also Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 729-03

23   (1998).  First, the USFS must develop land and resource management plans for units of the

24   National Forest System.  See 16 U.S.C. § 1604(a).  Second, the USFS is tasked with developing

25   site-specific projects to carry out the objective in the forest plan.  See 16 U.S.C. § 1604(i).

26   NFMA requires "consistency" between site-specific projects and the overall forest plan.  See Or.

27   Nat. Desert Ass'n v. United States Forest Serv., 957 F.3d 1024, 1034 (9th Cir. 2020).

28           Plaintiffs allege that the PFERP violates NFMA because the USFS failed to

13

1   "demonstrate consistency" with the 1995 Forest Plan.  This purely procedural claim is foreclosed

2   by the Ninth Circuit's decision in <u>Or. Nat. Desert Ass'n</u>.  There, the appellate court rejected a

3   similarly claim stating "our precedents. . . do not stand for the proposition that NFMA or the

4   APA, on their own, require the Forst Service to 'analyze and show,' in a contemporaneous

5   written document, that each of its actions conform to the applicable forest plan."  957 F.3d at

6   1033.  While revised planning rules promulgated in 2012 do in fact require the USFS to document

7   consistency with applicable forest plan standards in decision memoranda, <u>see</u> 36 C.F.R.

8   § 219.15(d), the 2012 rules apply only to projects associated with forest plans developed after

9   2012 when the revised rules became effective, <u>see</u> 36 C.F.R. § 219.17(c).  Here, the forest plan at

10  issue is the 1995 Shasta-Trinity National Forest Land and Resource Management Plan.  Thus, the

11  2012 revised rules do not apply and Plaintiffs' narrow NFMA claim is foreclosed under <u>Or. Nat.</u>

12  <u>Desert Ass'n</u>.

13          At the hearing on Plaintiffs' motion, Plaintiffs' counsel indicated the possibility of

14  amending the complaint to allege a substantive claim under NFMA, specifically that the PFERP

15  is not in fact consistent with the 1995 Forest Plan.  That as-applied claim, however, is not

16  currently before the Court.

17          For the foregoing reasons, the Court finds that Plaintiffs have not established either

18  a likelihood of success, or even serious questions, as to the merits of their NFMA claim as

19  currently pleaded.

20          2.      <u>NEPA</u>

21          NEPA requires federal agencies to consider the environmental consequences of

22  proposed major federal actions significantly affecting the quality of the environment.  <u>See</u> 42

23  U.S.C. § 4332(2)(C).  Federal agencies ordinarily fulfill their NEPA obligations by preparing an

24  environmental impact statement, an environmental assessment, or a categorical exclusion.  <u>See</u> 42

25  U.S.C. §§ 4336(a)(2), 4336(b)(1), and 4336(b)(2).  Revised regulations promulgated in July 2025

26  allow federal agencies to take emergency action before the NEPA process can be completed.  <u>See</u>

27  <u>e.g.</u> 7 C.F.R. § 1b.9(w).

28          Plaintiffs' NEPA claim turns on whether the USFS properly invoked 7 C.F.R.

14

1    § 1b.9(w), consistent with the definition of "emergency" contained in 7 C.F.R. § 1b.11(a)(13), to

2    implement the PFERP, which includes the two commercial timber sale contracts Plaintiffs seek to

3    enjoin.  As the parties acknowledge – and this Court agrees – the interplay between and

4    interpretation of these newly promulgated regulations is a question of first impression.  As such,

5    absent any binding authority, it is impossible to say that Plaintiffs have, at this extremely early

6    point in the litigation, met their burden of establishing a likelihood that they will prevail on the

7    merits of their NEPA claim.

8              Nonetheless, the Court finds that Plaintiffs' NEPA claim raises serious questions

9    on the merits.  "Serious questions are 'substantial, difficult, and doubtful, as to make them a fair

10   ground for litigation and thus for more deliberative investigation.'" Republic of the Philippines v.

11   Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation omitted).  Although "[s]erious questions

12   need not promise a certainty of success, nor even present a probability of success, [they] must

13   involve a 'fair chance of success on the merits.'" Id. (quoting National Wildlife Fed'n v. Coston,

14   773 F.2d 1513, 1517 (9th Cir. 1985)).

15             Section 1b.9(w) governs "Emergencies – Urgent but not immediate action," and

16   provides a process "[i]f emergency circumstances exist that make it necessary to take urgently

17   needed action before the NEPA process can be completed. . . ."  7 C.F.R. § 1b.9(w).  The

18   regulation further provides that where "urgent actions" as identified in this provision are not

19   likely to have a reasonably foreseeable significant environmental impact, but an emergency exists

20   that makes it necessary to urgently needed actions before preparation of an environmental

21   assessment, the USDA subcomponents may authorize alternative arrangements for environmental

22   compliance "so long as the alternative arrangements are limited to actions necessary to address

23   the emergency circumstance" 7 C.F.R. § 1b.9(w)(1).  Section 1b11(a)(13) defines "emergency" as

24   follows: "Emergency means a situation demanding immediate or urgent action, where delaying

25   action to follow standard procedures would be contrary to the public interest. . . ."  7 C.F.R. §

26   1b.11(a)(13).

27             Here, the October 2025 decision memorandum issued by USFS associated with the

28   1,200-acre PFERP provides the following justification for an "emergency" situation:

15

Trinity County has experienced numerous high-severity, landscape-scale wildfires. The recent 2025 Swift Complex-Peak Fire2, caused by lightning just inside the Trinity Alps Wilderness, demonstrated extreme fire behavior and rapid spread potential, placing northern Trinity County communities at risk. Suppression efforts, supported by favorable weather, presence of natural barriers and available suppression resources, have been able to successfully contain the fire after just over 500 acres of spread. The event underscores the urgent need for hazard reduction.

Similarly, the 2023 Deep Fire (4,198 acres) started in the Trinity Alps Wilderness, roughly 6 miles from the Peak Fire, threatening the Trinity Alps Resort and surrounding residences. In summer 2021, the River Complex (199,343 acres) which also ignited within the Trinity Alps Wilderness devastated the nearby community of Coffee Creek. These events highlight the ongoing vulnerability of communities in this area.

The project area identified for this emergency action fully lies within the wildland urban interface, as identified in Trinity County's Community Wildfire Protection Plan and two high risk firesheds identified in Secretarial Memorandum 1078-006 (Increasing Timber Production and Designating an Emergency Situation on National Forest System Lands, April 3, 2025). Trinity County has the highest wildfire risk in California and the second highest risk to homes. In addition to proximity to communities and limited access, the project area identified for treatment is especially at high risk for uncharacteristic wildfire due to the dense vegetation conditions resulting from over a century of fire suppression and lack of fire history in the area. The Shasta-Trinity National Forest believes the proposed emergency actions meet the Secretary's criteria for proactively addressing emergency conditions before they result in catastrophic loss of resources, property, economic activity, or human life.

The proposed emergency actions would implement approximately 1,200 acres of fuels reduction treatments that include fuel management zone development along forest roads to improve suppression capabilities and provide safe ingress and egress for fire personnel and the public around local communities and nearby properties to create defensible space within the wildland urban interface and complement ongoing defensible space treatments occurring on private lands.

The fuels reduction treatments would include mechanical treatment using variable density thinning to disrupt crown continuity and reduce/remove surface and ladder fuels. Hand thinning and piling of fuels would be utilized where equipment is restricted. In addition, treatments have been strategically identified to enhance planned and existing efforts on private and federal lands. To this end, treatments will expand upon contingency and containment lines associated with the Peak and Deep Fires and tie in with planned and existing fuel breaks on industrial timberlands. Fuel management zones were designed to incorporate strategic Potential Operational Delineation lines and reduce risk around critical ingress/egress (i.e., evacuation routes) for the local isolated communities.

Ultimately, the North Trinity project would be implemented along the State Route (SR) 3 corridor, primarily between Trinity Lake National Recreation Area and the Trinity Alps Wilderness. Northern Trinity County

16

features 'checkerboard' land ownership, with National Forest System lands interspersed among rural communities and private timberlands (primarily Sierra Pacific Industries). SR 3 is the only viable travel corridor, supported by county and forest roads that serve as critical ingress/egress routes to rural residences and wilderness access. Critical assets at risk include residential infrastructure, high-voltage transmission lines, small airports, the Trinity and Lewiston Dams (hydroelectric facilities supplying water to the Central Valley Project), multiple communication sites, and community water sources. The local economy depends heavily on timber and recreational tourism linked to Trinity Lake and access to the Trinity Alps Wilderness. The aim of this project is to reduce wildfire risk to rural communities by lowering hazardous fuel loads, improving safety along evacuation routes, and enhancing resilience of adjacent forest ecosystems.

Fire suppression efforts are hindered in this area due to topography, fuels, minimal access and Wilderness limitations. Treatments from the North Trinity project that have been prioritized under this emergency action proposal include areas located in close proximity to designated wilderness and values at risk (i.e., rural communities and critical infrastructure). Local communities such as Long Canyon, Covington Mill, Ridgeville, Pinewood Cover, Trinity Alps Resort and associated residences, are nearly surrounded by dense forest land, in a county where 73 percent of the land base is in federal ownership. In addition, these areas have no known fire history in over one hundred years, which has resulted in overly dense forests with high-risk fuel conditions. These treatments will assist in overall wildfire risk reduction by improving suppression opportunities to contain a fire coming out of the wilderness and lower the risk of a fire burning into the wilderness where control features are minimal.

ECF No. 18-2 (Exhibit 1 to Declaration of Tara Jones).

At the December 10, 2025, hearing, the Court inquired as to what had transpired between November 2024 when the larger North Trinity County Community Risk Reduction Project was initially scoped to begin the NEPA review process, and October 2025 when the PFERP was authorized. Defense counsel focused her answer to this question almost exclusively on the Peak Fire, which burned near the PFERP area in August 2025. According to defense counsel, the Peak Fire highlighted to USFS as well as local stakeholders the existence of various problems associated with wildfires in the area. Specifically, counsel indicated that the unique topography of the area made both access by firefighters and egress by members of the community hazardous during a fire outbreak.

The Court finds this explanation to be somewhat at odds with the justification outlined in the October 2025 decision memorandum. While the decision memorandum references the 2025 "Swift Complex-Peak Fire2" wildfire, it also references wildfires which occurred in

17

2023 (the Deep Fire) and 2021 (the River Complex).  See ECF No. 18-2.  The October 2025

decision memorandum states that the 2023 and 2021 fires ". . .highlight the ongoing vulnerability

of communities in this area."  Id.  Thus, contrary to counsel's assertion at the hearing that the

2025 Peak Fire was the new event highlighting the need for an emergency response and deviation

from NEPA environmental assessment mandates, the October 2025 decision memorandum

highlights two fire events which occurred before the larger North Trinity Project was first scoped

in November 2024.  Additionally, while the October 2025 decision memorandum cites the

topography in the region as a need for emergency action, the memorandum does not explain if or

how the topography changed after the North Trinity Project was scoped in November 2024 such

that an emergency situation was presented in late 2025.  These issues present for this Court

serious questions as to the propriety of USFS invoking 7 C.F.R. § 1b.9(w) to implement an

emergency response which side-steps the requirements of NEPA, particularly where, as here by

Defendants' admission, the 1,200-acre project area encompasses NSO habitat.

        For example, if a wildfire in 2021 illuminated for USFS the need for action, why

was such action only implemented on an emergency basis late in 2025 after new regulations were

promulgated in July 2025?  And how does the agency's citation to topography, which has not

been shown to have changed, justify an emergency?  Additionally, as Plaintiffs maintain, the

USFS current interpretation of § 1b.9(w) would seem to allow for an emergency response which

avoids NEPA requirements in almost any situation the agency deems presents a wildfire danger

and could allow for emergency activities anywhere within the National Forest System absent

NEPA review.  Such an interpretation of the regulation would render NEPA meaningless and

allow an Executive Branch agency to undertake almost any activity it wants without

environmental review protections mandated by Congress.

        While the Court agrees with Defendants that, at this stage of the proceedings,

Plaintiffs have not demonstrated that they are likely to succeed on the merits of their NEPA

claim, which would be an extremely difficult showing to make on a question of first impression,

the Court finds that Plaintiffs' NEPA claim is plausible and has a fair chance of success upon

further deliberative investigation.

1

      **C.**     **Balance of Equities and Public Interest**

2

      Where the federal government is involved, the inquiries as to the balance of

3

equities and the public interest merge into a single analysis in the absence of a claim under the

4

Endangered Species Act.  See Nken v. Holder, 556 U.S. 418, 435 (2009); see also Env't Prot.

5

Info. Ctr. v. Carlson, 968 F.3d 985, 991 (9th Cir. 2020); c.f. Cottonwood Env't Law Ctr. v. U.S.

6

Forest Serv., 789 F.3d 1075, 1090 (9th Cir. 2015) (citing TVA v. Hill, 437 U.S. 153, 185 (1978),

7

and Amoco Prod. Co., 480 U.S. at 543 n.9, and stating "courts do not have discretion to balance

8

the parties' competing interests in ESA [Endangered Species Act] cases" because "the equities

9

and public interest factors always tip in favor of the protected species").

10

      Here, the federal government is a party, and Plaintiffs do not present in their

11

complaint any claims under the Endangered Species Act.  See generally ECF No. 1.  Thus, the

12

Court will consider the equities and public interest to determine whether the balance tips sharply

13

in Plaintiffs' favor, as is required to obtain injunctive relief in light of the Court's findings above.

14

      Plaintiffs argue as follows:

15

16

     The balance of equities favors injunctive relief here because of the irreparable environmental injury as well as the public's interest in government compliance with the law. Plaintiffs anticipate that Defendants will lean into the public's interest in fire mitigation, but the narrow scope of Plaintiffs' requested TRO ensures that some fuels reduction activities can move forward even with the TRO in place. On the flip side, to avoid a TRO, Defendants must demonstrate that the specific activities sought to be enjoined—intensive logging operations within NSO nesting, roosting, and foraging habitat—are so essential for fire mitigation that such operations outweigh all other interests. *See Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction"). Defendants cannot make that showing.

17

18

19

20

21

22

     On the balance of harms inquiry, the question is not whether the Forest Service can move forward with its planned activities ever, rather, the question is whether the Forest Service's need to conduct such activities **during the pendency of this litigation** is determinative. Without any evidence that implementing commercial logging of NSO habitat must occur prior to completion of the NEPA analysis (and ESA Section 7 consultation), the balance of harms does not weigh in the Forest Service's favor. The public's interest in making sure that federal agencies manage public lands in compliance with environmental laws "invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991).

23

24

25

26

27

     Finally, procedural NEPA violations can and do warrant

28

preliminary relief. In *Cottrell*, the Ninth Circuit found that the balance of equities weighed in favor of the plaintiff where the plaintiff presented serious questions on the merits of its claim that the Forest Service violated its administrative appeal procedures. According to the court: "[the plaintiff] was harmed by its inability to participate in the administrate appeals process, and that harm is perpetuated by the Project's approval. The administrative appeals process would have allowed AWR to challenge the Project under both NFMA and NEPA, and to seek changes in the Project before final approval by the Forest Service." 632 F.3d at 1137–38. Here too, by short-circuiting the NEPA process, the Forest Service evaded public review and comment on the full NEPA document, where members of the public, scientists, and other agencies like the Service could weigh in, and attempt to shape a more balanced and effective Project. *See* Decl. Dunn, Ex. 4 at 1–2 (scoping proposal advised of a future 30-day opportunity to comment on the Draft EA). Instead, the Forest Service has begun implementing the Project before careful consideration of environmental impacts under NEPA and demonstrated compliance with NFMA. This is contrary to the public interest. *See Cottrell*, 623 F.3d at 1138 (recognizing that "careful consideration of environmental impacts *before* major federal projects go forward . . . comports with the public interest); *accord S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (holding that issuance of an injunction pending consideration of environmental impacts under NEPA comported with the public interest).

ECF No. 6-1, pgs. 30-32 (bold in original).

As to the equities and public interest, Defendants contend:

 The Emergency Response actions address the urgent need to mitigate wildfire and public safety risks created by the dangerous combination of frequent recent fires, dense forests, high surface and ladder fuels, challenging terrain and proximity to wilderness, isolated communities, and critical infrastructure. Addressing these risks is in the public interest because it could save lives and homes that would otherwise be lost while the Forest Service completes the NEPA process for the larger Trinity Risk Reduction Project. *Conservation Cong. v. U.S. Forest Serv.*, 774 F. App'x 364, 368 (9th Cir. 2019) (affirming district court's denial of injunctive relief and its finding that "steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing public roads, and in mitigating the intensity and severity of future fires outweighs the public interests that support an injunction." (internal citations omitted)). Where, as here, so many benefits flow from a project, enjoining that project is not in the public interest. *See, e.g.*, *Earth Island Inst. v. Carlton*, No. Civ. S-09-2020 FCD/EFB, 2009 WL 9084754, at *28 (E.D. Cal. Aug. 20, 2009), *aff'd*, 626 F.3d 462 (9th Cir. 2010) (issuance of injunction would not be in public's interest because defendants offered evidence that if the project did not proceed, "the public w[ould] lose the benefits of the reforestation efforts, which w[ould] expedite forest regeneration, recover forested conditions, prevent domination of shrub species, and repair habitat structure for wildlife").

 Any delay of the Emergency Response activities would jeopardize the contractors' ability to complete the contracted-for work before the termination of the contracts on January 31, 2026, and February 1, 2026,

respectively. Due to seasonal restrictions on fuel reduction treatments, this work could not resume until after the next fire season next fall. Jones Decl. ¶ 63. Nearby communities like Lake Forest Estates and Long Canyon, which would have benefited from reduced wildfire risk and safe exit routes from the Emergency Response, will remain as they are today—extremely vulnerable to catastrophic wildfire through another fire season. Although Plaintiffs speculate that it would be good enough for some fuels reduction activities (outside the two commercial sales) to move forward, Pls.' Br. 22-23, the commercial work is integral to the Emergency Response and without it the fire mitigation benefits of the Emergency Response cannot be realized. Jones Decl. ¶¶ 59-61.

A Court order delaying the emergency response activities would also result in immediate and certain financial harm to the Forest Service. Although money damages are not dispositive, an injunction could require the Forest Service to pay contractors funds it could use for other work, which coupled with the loss of the complete Emergency Response effort, harms the public interest. The Forest expects to collect approximately $357,073 in receipts from the Rainier sale and approximately $235,097 in receipts from the Long Canyon sale. Decl. of Kori Kelly ("Kelly Decl.") ¶¶ 4-5. If the Court were to order a preliminary injunction, the Forest Service would need to suspend both contracts, and the agency could be liable to the purchasers for liquidated damages caused by the delay under the contract. *Id.* ¶ 9. These damages could reach upwards of $400,000 for both contracts combined if the duration of the preliminary injunction suspension exceeds either six months of normal operating season (April 1 to November 30) time, or one calendar year from the date of the suspension order, *id.*, which would likely be the case here where the parties are in the preliminary stages of litigation. Even if the Court were only to enjoin the sales for a shorter duration through a TRO, the purchasers may still be entitled to claim damages for delay or interruption of operations caused by the Forest Service's short-term suspension of the contracts, including equipment costs. *Id.* ¶ 8. Such claims could be between $10,000 and $25,000. *Id.* These figures do not account for the delay in achieving much-needed fuels reduction in this critical area—which could extend further into the future if the contractors terminate the contracts, and the Forest Service must re-bid the sales—or the loss of jobs and income to the local community. *Id.* ¶ 10. . . . .

ECF No. 18, pgs. 26-28.

At the outset, the Court does not agree with Plaintiffs' contention that "Defendants must demonstrate that the specific activities sought to be enjoined—intensive logging operations within NSO nesting, roosting, and foraging habitat—are so essential for fire mitigation that such operations outweigh all other interests."  When seeking injunctive relief, the movant "carries the burden of proof on each element. . . ."  Envtl. Council of Sacramento v. Slater, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  Plaintiffs here bear the burden of establishing that the balance equities and public interest tips sharply in their favor.

Plaintiffs contend that the equities and public interests in their favor are: (1)

1    irreparable environmental damage; and (2) government compliance with the law, specifically

2    NEPA.  Defendants point to the following factors on their side of the scale: (1) wildfire

3    mitigation; (2) risks to public safety; and (3) financial harm resulting from loss of revenue from

4    the Rainier Contract and Long Canyon Contract, as well a liquidated damages which would be

5    owed to the two contractors should the commercial logging projects be enjoined.  The Court finds

6    that these present closely competing interests.  The Court agrees with Plaintiffs that protection of

7    the environment and government compliance with the law are indeed extremely important

8    interests.  Of comparably compelling importance, however, are the government's interests in

9    preventing devastating wildfires and in public safety.  Plaintiffs have not met their burden of

10    showing that their interests and those of the public tilt sharply in their favor.

11            Plaintiffs argue that the Court must consider the balance of equities and public

12    interest in the context of the scope of the injunction being sought.  Doing so confirms this Court's

13    opinion that the balance of these factors does not tilt sharply in Plaintiffs' favor.  Here, the

14    injunction sought is extremely narrow – an order enjoining commercial logging activity along

15    specific roads in an area encompassing approximately 430 acres.  As discussed above, the two

16    logging contracts at issue have been crafted in such a way as to avoid a nearby occupied NSO

17    core.  Thus, within the narrow scope of relief sought by Plaintiffs, the potential for environmental

18    harm is being mitigated.

19            Further, as reflected in the October 2025 decision memorandum, despite

20    compliance with NEPA environmental assessment requirements, USFS nonetheless has taken

21    steps to mitigate damage to NSO habitat by way of the PFERP.  The October 2025 decision

22    memorandum reflects the following efforts:

23            The Shasta-Trinity National Forest has been conducting Streamlined
            Section 7 ESA Consultation with U.S. Fish and Wildlife Service
24            (USFWS) for the North Trinity project. Much of the project is located
            within northern spotted owl (NSO) Critical Habitat, Late Successional
25            Reserves, and occupied NSO activity centers. As part of the streamlining
            process, the Forest has been working with the USFWS to incorporate
26            measures to minimize impacts to NSO and their habitat while still meeting
            the "Purpose and Need" of reducing wildfire risk to communities and
27            restoring forest resilience. Multiple field visits and project specific
            meetings and discussions have been conducted with the Forest and
28            USFWS consultation biologists. Field visits have informed habitat

typing for the project and the Forest is in agreement with the USFWS on the habitat mapping for the project. USFWS have participated in interdisciplinary team meetings for the project and have provided recommendations for resource protection measures, treatment prescriptions, and treatment units that have been incorporated into the proposed action. The project is likely to result in a formal consultation with the USFWS. Overall, development of the project has been well coordinated with the USFWS and they are generally supportive of the treatments proposed.

ECF No. 18-2.

Finally, stopping the logging projects now would mean that they likely could not resume until late 2026 at the earliest, possibly late 2027, in either case after the LOP closes in mid-September. This means that local communities could be at extreme fire risk for up to two additional summer fire seasons. The Court observes that, should such fires occur within the project area absent fire mitigation efforts, not only would local communities be put in extreme harm's way, NSO habitat would also be lost forever, as would other forest features which Plaintiffs' members enjoy.

## III. CONCLUSION

Based on all the foregoing, the Court declines to issue either a temporary restraining order or preliminary injunction to enjoin ongoing operations under either the Rainier Contract or the Long Canyon Contract. That said, the Court has been presented with evidence that these two commercial logging contracts carry with them very specific restrictions as to the trees permitted to be cut, including limitations associated with tree size, species, location, and proximity to other trees. The Court expects the logging operations to continue subject to strict compliance with these restrictions and would accept further motions should Plaintiffs have evidence to the contrary. The Court also expects these logging operations to cease by the stated expiration dates (February 1, 2026, for the Rainier Contract and January 31, 2026, for the Long Canyon Contract). Again, the Court will receive further motions should logging operations continue past these dates.

By separate order, the Court will direct the parties to submit a joint scheduling

1    report and appear for a scheduling conference.

2           Accordingly, IT IS HEREBY ORDERED that Plaintiffs' combined motion for a

3    temporary restraining order and preliminary injunction, ECF No. 6, is DENIED.

4

5    Dated:  December 15, 2025

6                                                    _____
                                                     DENNIS M. COTA
7                                                    UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           24